[No. B224242. Second Dist., Div. Two. June 30, 2011.]

SANTA CLARITA ORGANIZATION FOR PLANNING THE ENVIRONMENT, Plaintiff and Appellant, v. CITY OF SANTA CLARITA et al., Defendants and Respondents; HENRY MAYO NEWHALL MEMORIAL HOSPITAL et al., Real Parties in Interest and Respondents.

1044

**COUNSEL**

Law Offices of Babak Naficy and Babak Naficy for Plaintiff and Appellant.

Carl K. Newton, City Attorney; Burke, Williams & Sorensen, Brian A. Pierik and Amy E. Hoyt for Defendants and Respondents.

Cox, Castle & Nicholson, Tamar C. Stein, James R. Repking and Kathryn J. Paradise for Real Parties in Interest and Respondents.

## OPINION

CHAVEZ, J.—Santa Clarita Organization for Planning the Environment (SCOPE) appeals from the trial court's denial of its writ of mandate. Through the writ of mandate, SCOPE sought to set aside the City of Santa Clarita's (the city) approval of a master plan (Master Plan) to allow real parties in interest Henry Mayo Newhall Memorial Hospital (the hospital) and G&L Valencia, LLC (collectively real parties in interest), to expand the hospital and medical office building facilities on the existing hospital campus (the project).[1] We reject SCOPE's claims and affirm the decision of the trial court.

## CONTENTIONS

SCOPE raises two contentions on appeal. First, SCOPE argues that the city's conclusion that complete mitigation of the project's impact on climate change is infeasible is not supported by substantial evidence or adequate analysis in the record.

In addition, SCOPE argues that the city failed to proceed in a manner required by law when it concluded that the project will not adversely affect adjacent residents and the character of the neighborhood. Specifically, SCOPE argues that the city did not have the discretion to engage in a balancing of the project's harm against the project's overall benefit to the city.

## FACTUAL BACKGROUND

*The hospital*

The hospital has served the Santa Clarita Valley and neighboring areas for nearly 40 years. Since opening in 1975, the hospital has expanded into a 221-bed, full-service, nonprofit community hospital with over 1,000 employees and 360 medical staff members. The site currently contains 11 buildings or 340,071 square feet of building space. Currently, 43 percent of the site is landscaped and none of the buildings is more than two stories high. The tallest building, which is the hospital itself, is only 44 feet high. Parking is limited to 972 surface parking spaces, including 74 handicap stalls and seven emergency vehicle stalls. The hospital campus currently lacks sufficient parking and hospital space and does not have a useable helipad.

---

[1] Real parties in interest have filed a responsive brief addressing the arguments presented by SCOPE. The city has filed a joinder in real parties in interest's brief.

*The project*

The project at issue is a long-range plan to expand the hospital campus. At full buildout, the amount of hospital and medical office space on the site would nearly double from its current size of 340,071 square feet to 667,434 square feet.

The project includes the construction of an additional 120 inpatient hospital beds, 18 new intensive care unit beds, and nine new beds in a nursing pavilion. The project also provides 200,000 gross square feet of additional medical office space for added outpatient care, hospital administration, and associated medical uses, as well as an additional 1,263 parking spaces. Nine proposed structures will be built over a 15-year period, including three medical office buildings, one inpatient hospital building, a central plant building, two helipads, and four parking structures. Additionally, real parties in interest plan to demolish an 8,000-square-foot building currently on the site and construct landscaping and traffic improvements.

In oral testimony at the September 23, 2008 city council hearing, Roger Seaver, president and CEO of the hospital, explained to the city council that with the current capacity of the hospital and existing demand, citizens of the Santa Clarita Valley community would soon have to seek medical care outside of the valley. Jim Barber, president of the Hospital Association of Southern California, commented that while demand and needs for hospital facilities are increasing, hospital capacity is actually going down. Fifteen hospitals in Los Angeles County have closed in the past 15 years, as well as five emergency rooms. Barber stressed the need for an integrated medical campus for good communication and efficiency. There was testimony that the population in the Santa Clarita Valley has more than tripled since the hospital opened in 1975, and that hospital expansion is necessary in order to meet the needs of the growing community.

The project site is zoned "Residential Low" (RL) on the city's zoning map. It is intended for single-family detached homes at a density of up to 2.2 dwelling units per gross acre. However, the RL zone permits hospital and related uses with the approval of a conditional use permit (CUP) or Master Plan.

*Project approval process*

In August 2004, real parties in interest filed an application for a CUP to expand the hospital campus. In compliance with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.), the city circulated a notice of preparation (NOP) of an environmental impact report (EIR) in November 2004.

In 2005, the city adopted an update to its unified development code (UDC) which required real parties in interest to obtain a Master Plan. In response to the new ordinance, real parties in interest modified the project application to seek a Master Plan instead of a CUP. In 2006, real parties in interest further modified the application to request a development agreement.

The city released a draft EIR in November 2005 and a revised draft EIR in September 2006. After relevant planning commission hearings, the city circulated a final EIR in January 2007. Following further hearings and revisions, the city circulated a revised draft EIR in June 2008. The June 2008 revised draft EIR included an analysis of project-related greenhouse gas (GHG) emissions. The city then circulated a September 2008 revised draft EIR. The November 2008 final EIR (FEIR) included the September 2008 revised draft EIR and technical appendices; comments and written responses to comments on the June 2008 and September 2008 revised draft EIR's; responses to oral comments received at the September 23, 2008 city council hearing; and a mitigation monitoring and reporting program. It also incorporated by reference the 2005 and 2006 draft EIR's, as well as all public and agency comments and responses with respect to those documents.

On November 19, 2008, the city council held a public hearing. At the hearing, the city council passed resolution No. 08-101, adopting a statement of overriding considerations and certifying the FEIR. At the same meeting, the city council also conducted the first reading of an ordinance for development agreement No. 06-001. On December 9, 2008, the city approved ordinance No. 08-17, formally adopting the development agreement between the city and real parties in interest. As part of ordinance No. 08-17, the city found that the development agreement will not "[a]dversely affect the health, peace, comfort or welfare of persons residing or working in the surrounding area." (Italics omitted.) Resolution No. 08-102, the city's adoption of the Master Plan, contains a similar finding.

In support of this finding, the city explained that "operational characteristics of the hospital campus will not change substantially," and that implementation of the Master Plan is "intended to preserve the desired neighborhood character." The city council found that the Master Plan would create a medical campus that "balances the needs for medical service expansion with the need to preserve the character of the Valencia Master Plan neighborhoods that surround this regional services institution."

*GHG emissions associated with the project*

In June 2008, the Governor's Office of Planning and Research (OPR) issued a technical advisory calling for lead agencies to "make a good-faith

effort, based on available information, to calculate, model, or estimate the amount of $CO_2$ and other GHG emissions from a project, including the emissions associated with vehicular traffic, energy consumption, water usage and construction activities." (<http://opr.ca.gov/ceqa/pdfs/june08-ceqa.pdf> p. 5 [as of June 30, 2011].) The agencies were called upon to then determine whether these emissions have a significant environmental impact. (*Id.* at p. 6.)

In accordance with the June 2008 technical advisory, the city calculated GHG emissions in its September 2008 draft EIR. In doing so, the city used three categories of emissions sources: scope 1, which included emission sources owned or controlled directly by the project (i.e., natural gas combustion, boilers, furnaces, etc.); scope 2, which included GHG emissions from energy (purchased energy, energy from water use, energy from waste disposal); and scope 3, which included indirect emissions that are a consequence of activities of the project, but which are not owned or controlled by the project, including GHG emissions from transportation sources. The city concluded that impact from "project-related Scope 1 and Scope 2 GHG emissions would be less than significant." However, despite the implementation of recommended mitigation measures, "GHG emissions attributable to project-related Scope 3 emissions sources (mobile sources) would remain significant." This significant impact was described as "unavoidable."

## PROCEDURAL HISTORY

SCOPE is a nonprofit organization that is concerned with protection of the environment. On December 22, 2008, SCOPE and Community Advocates for Healthcare SCV (collectively petitioners) filed their petition for writ of mandate.[2] Respondents demurred, and after the trial court sustained the demurrer with leave to amend, petitioners filed a second amended petition which is the operating petition in this case.

In the opening brief on the merits filed in support of the petition, petitioners argued, among other things, that "Neither the record nor the EIR contain a scintilla of evidence or analysis to support the conclusion that more could not be done to reduce or mitigate the Project's contribution to global warming." Petitioners explained that SCOPE had included with its comments to the city "a list of potential mitigation measures developed by the Office of Attorney General." Petitioners argued that the city's response to the Attorney General's suggested mitigation measures was "inadequate."

In addition, petitioners challenged the city's finding that the Master Plan did not adversely affect the health and welfare of neighboring residents.

---

[2] Community Advocates for Healthcare SCV is not a party to this appeal.

Petitioners argued that the finding was "dishonest" and must be set aside because the city "was not permitted to weigh the impact to the residents against the alleged overall benefit to the community."

Real parties in interest opposed the petition, arguing, among other things, that the petitioners failed to exhaust their administrative remedies and that the EIR complied with CEQA.

The hearing took place on February 11, 2010. The trial court issued a tentative decision denying the petition, which became the court's statement of decision. Among other things, the trial court held that: "The City was not required to adopt all measures recommended by the Attorney General's Letter. Lead agencies have wide discretion to determine feasibility based on a balancing of factors. City of Marina v. Board of Trustees of Calif. State Univ. (2006) 39 Cal.4th 341, 368–369. The letter itself warns that 'the measures cited may not be appropriate for every project.' 20815. Moreover, only one of the four sections of the letter is even applicable to the project. 20843. Even so, the City found that the project embraced 'many of the strategies identified as key to combating global climate change.' Id."

As to petitioners' argument that the city's balancing of the project's benefits and detriments was improper, the court found: "An agency's view of the meaning and scope of its own ordinance is entitled to great weight. Friends of Davis v. City of Davis (2000) 83 Cal.App.4th 1004, 1015. The City Council's determination that the project was consistent with its plan and UDC was reasonable and entitled to deference. Unlike CEQA, the UDC allows for the weighing of the project benefits and impacts, therefore, the court finds that the Council's consideration and conclusion that the project was consistent with the UDC is supported by substantial evidence."

On April 30, 2010, petitioners filed their notice of appeal.

## DISCUSSION

### I. *Standard of review*

"On appeal, the appellate court's 'task . . . is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law.' [Citation.] The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. [Citations.]" (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375–1376 [43 Cal.Rptr.2d 170] (*Gentry*).)

In any action challenging the decision of a public agency, "the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5; see *Gentry, supra,* 36 Cal.App.4th at p. 1375.) However, "[n]oncompliance with substantive requirements of CEQA or noncompliance with information disclosure provisions 'which precludes relevant information from being presented to the public agency . . . may constitute prejudicial abuse of discretion . . . regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' [Citation.]" (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 946 [91 Cal.Rptr.2d 66]; see Pub. Resources Code, § 21005, subd. (a).) In other words, when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. (*County of Amador,* at p. 946.)

"Substantial evidence" is defined in the CEQA guidelines as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a).) "The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. [Citation.]" (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326] (*Save our Peninsula*).)

We presume the correctness of the agency's decision. "The project opponents thus bear the burden of proving that the EIR is legally inadequate. [Citations.]" (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 117.)

## II. *Exhaustion of administrative remedies*

We first address an issue raised by real parties in interest in their responsive brief: whether SCOPE exhausted its administrative remedies as to some of the issues it raises before this court.

██ Exhaustion of administrative remedies is a jurisdictional prerequisite to challenging any project approval. "An action or proceeding shall not be brought . . . unless the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during the public comment period . . . or prior to the close of the public hearing on the project before the issuance of the notice of determination." (Pub. Resources Code, § 21177, subd. (a); see *Tracy First v. City of Tracy* (2009) 177

Cal.App.4th 912, 926 [99 Cal.Rptr.3d 621].) " ' "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." [Citation.]' [Citation.]" (*Tracy First*, at p. 926.) This requirement serves "to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review. [Citation.]" (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 384 [110 Cal.Rptr.2d 579].)

Real parties in interest argue that the following issues were never raised before the city: (1) that the city should have considered the specific "examples" of mitigation measures now raised by SCOPE; (2) that the city's response to SCOPE's October 16, 2008 comment, which attached the Attorney General letter, was inadequate; and (3) that substantial evidence does not support the findings regarding the infeasibility of mitigation of GHG emissions in resolution No. 08-101.

■ SCOPE responds that while CEQA does require petitioners to raise their concerns with a lead agency before filing a lawsuit, less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding. SCOPE cites *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 163 [217 Cal.Rptr. 893] (*Citizens*), which explained the logic behind this rule: "This is because ' "[i]n administrative proceedings, [parties] generally are not represented by counsel. To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely and specific objection would be unfair to them." [Citation.] . . .' [Citation.]"

We question whether a rule protecting individuals who are not well versed in the technicalities of administrative proceedings is properly applicable to SCOPE. As SCOPE notes in its opening brief, it "has been an active participant in the City of Santa Clarita . . . land use and environmental review process, and has in the past successfully challenged the City's land-decisions." SCOPE indicates on its Web site that it has extensive experience participating in administrative proceedings: "Over the last 21 years SCOPE has reviewed many dozens of projects from housing developments to oil pipelines, landfills and water appropriation applications. Members regularly attend City and County planning hearings as well as participating in many other agency meetings to encourage our government officials to preserve oaks and the Santa Clara River, provide adequate schools, libraries and roads for new development and to promote clean air and water." (<http://www.scope.org/21years.html> [as of June 30, 2011].)

SCOPE has also participated in judicial proceedings seeking review of administrative action. (See, e.g., *Santa Clarita Organization for Planning the*

*Environment v. County of Los Angeles* (2007) 157 Cal.App.4th 149 [68 Cal.Rptr.3d 449].) Given its expertise, and considering the number of projects SCOPE has been involved in over the years, it seems disingenuous for SCOPE to claim that it should be held to a standard applicable to parties unfamiliar with the technicalities of administrative proceedings and subsequent judicial proceedings. Despite these reservations, we decline to depart from precedent and therefore evaluate real parties in interest's claim of failure to exhaust administrative remedies under the less stringent standard articulated in *Citizens*.

SCOPE referred to the inadequacy of GHG mitigation only once, in its comment letter of October 16, 2008, which attached the list of mitigation measures developed by the Attorney General. SCOPE stated, "We have attached the list of mitigation measures developed by the Office of the Attorney General to our comments. We request that the City incorporate these measures into any project approval that might be granted for this project." Despite the general nature of SCOPE's comment, we find that this letter "fairly apprised" the city of SCOPE's concerns. (*Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1750 [12 Cal.Rptr.2d 308].) Even applying the lenient standard that SCOPE has advocated, we conclude that SCOPE's claims have not been forfeited for failure to exhaust administrative remedies.

III. *Mitigation of impact on climate change*

In this section, we review the merits of SCOPE's claims regarding mitigation of climate change or GHG emissions. We conclude that the city's analysis was adequate, and that substantial evidence supported its findings.

A. *CEQA requirements regarding mitigation of climate change*

CEQA requires that agencies "mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." (Pub. Resources Code, § 21002.1, subd (b).) Public Resources Code section 21081 provides that:

"[N]o public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless both of the following occur:

"(a) The public agency makes one or more of the following findings with respect to each significant effect:

"(1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment.

"(2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency.

"(3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report.

"(b) With respect to significant effects which were subject to a finding under paragraph (3) of subdivision (a), the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment."

██ "CEQA does not authorize an agency to proceed with a project that will have significant, unmitigated effects on the environment, based simply on a weighing of those effects against the project's benefits, unless the measures necessary to mitigate those effects are truly infeasible." (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 368–369 [46 Cal.Rptr.3d 355, 138 P.3d 692] (*City of Marina*); see also Cal. Code Regs., tit. 14, § 15126.4, subd. (a)(1) ["An EIR shall describe feasible measures which could minimize significant adverse impacts, including where relevant, inefficient and unnecessary consumption of energy."].) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Cal. Code Regs., tit. 14, § 15364.)

### B. *The city's finding regarding global climate change*

In accordance with the CEQA requirements set forth above, resolution No. 08-101 contained an attachment entitled "Findings Required by CEQA." Section 1.1.4 of the attachment is captioned "Cumulative Global Climate Change." In this section, the city stated that, "The project's contribution to cumulative greenhouse gas emissions from vehicle exhaust are considered to have a significant effect on Global Climate Change. Construction of the Master Plan project would also therefore result in a significant and unavoidable cumulative impact in regards to global climate change."

However, the report then set forth various facts, and referred to various mitigation measures, which indicated "that the significant effects of the

proposed project have been reduced or avoided to the extent feasible." Nevertheless, despite these mitigation measures, "certain significant impacts on global climate change remain, and are thus, unavoidable."

SCOPE presents two arguments regarding the city's findings regarding mitigation measures: (1) that the city's conclusion that adequate mitigation of the project's cumulative impact on climate change is infeasible is not adequately explained and (2) that this conclusion is not supported by substantial evidence.

### C. *Adequate explanation for the city's conclusion is provided*

SCOPE argues that "[n]either the City's findings nor the FEIR include any facts or analysis to support and sustain" the city's conclusions regarding the project's impact on climate change. SCOPE acknowledges that, in exhibit A to resolution No. 08-101, there is an explanation of the city's finding that the project's impact on climate change is unavoidable. This explanation recites a number of traffic and air quality mitigation measures which the city contends will reduce the project's impact on climate change. However, SCOPE protests that "[t]he City's finding does not assert that the City ever considered or analyzed any other mitigation measures that could potentially reduce the project's GHG emissions or otherwise mitigate the Project's cumulative impacts."

SCOPE does not cite any specific authority indicating that the city was required to set forth an analysis of each mitigation measure that it considered and rejected as infeasible. Citing *Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1029 [68 Cal.Rptr.2d 367] (*Los Angeles*), SCOPE contends that the "FEIR violates CEQA because it did not specifically consider and discuss any of the mitigation measures suggested by the Attorney General's letter."

First, we note that the city considered, and in fact implemented, several measures which "are consistent with the recommendations in Section 1 of the Attorney General['s letter]." The city's response to SCOPE's comments stated, in part:

"It is important to note that the project's design, as an infill development in close proximity to public transportation and as an employment center near residential neighborhoods, embraces many of the strategies identified as key to combating global climate change. In addition, mitigation related to energy efficiency . . . and solid waste reduction . . . has already been included for the proposed project. These measures are consistent with the recommendations in Section 1 of the Attorney General['s letter].

"In addition, Section 5.1, Land use, . . . includes a discussion of Environmental Sustainability. The discussion notes that the City will be considering a

number of the potential mitigation measures presented in Section 1 as part of its current General Plan Update . . . ."

■ Furthermore, the *Los Angeles* case does not support SCOPE's position that the city was required to specifically address the numerous mitigation measures listed in the Attorney General letter. In *Los Angeles*, the Los Angeles Unified School District (LAUSD) petitioned for a writ of mandate compelling the City of Los Angeles to vacate its resolution approving a development. The petition challenged the sufficiency of the EIR because, among other things, it failed to discuss feasible measures for mitigating the effects of increased air pollution on two nearby schools including, specifically, the feasibility of air-conditioning and filtering at the schools so that windows could be closed against the polluted air. (*Los Angeles, supra,* 58 Cal.App.4th at p. 1028.) LAUSD had *specifically* suggested this mitigation measure to the city during the administrative process, and the city failed to directly respond. (*Id.* at p. 1029.) The *Los Angeles* court confirmed that "an EIR need not analyze ' " 'every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects.' " ' [Citation.]" (*Ibid.*) However, because LAUSD had raised a specific, concrete suggestion, the court found the city was required to respond: "In keeping with the statute and guidelines, an adequate EIR must respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible. [Citations.]" (*Ibid.*)

Here, in contrast, SCOPE submitted a letter containing more than 50 general suggestions. SCOPE did not single out any specific suggestions from this list, but instead articulated a broad request that the city "incorporate these measures into any project approval that might be granted for this project." The letter itself indicates that "the measures cited may not be appropriate for every project." Considering the large number of possible mitigation measures set forth in the letter, as well as the letter's indication that not all measures would be appropriate for every project, it is unreasonable to impose on the city an obligation to explore each and every one.

SCOPE acknowledges that such a request would be unreasonable, and was not what was intended with its comment letter. Instead, SCOPE applauds the trial court's interpretation of SCOPE's request: "I think fairly read, the letter said here's a list of mitigation measures and you should consider using at least some of them."

As SCOPE concedes, the city did incorporate some of them. The city's response to SCOPE's letter pointed out that some of the already imposed mitigation measures "are consistent with the measures suggested by the Attorney General." SCOPE's position that its request required the city to

explore in writing further mitigation measures—although which specific measures were never articulated—regardless of their feasibility, is simply not supportable under the law.[3]

*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12] (*Topanga*) does not suggest otherwise. In *Topanga*, the Supreme Court addressed a challenge to a county agency's decision to permit a variance. The high court held that a governing administrative agency, in adjudicating an application for a variance, must make findings which will enable the parties to determine whether and on what basis they may seek review and, in the event of review, to apprise the court of the basis for the agency's action. (*Id.* at p. 514.) Specifically, the planning committee's findings did not include comparative data from surrounding properties—information which was critical to a determination that the variance had been properly permitted. (*Id.* at pp. 520–521.) Here, there is no contention that the city failed entirely to make critical findings allowing an understanding of the basis for the city's actions. Instead, SCOPE claims that the city failed to address nonspecific additional mitigation measures above and beyond those which were delineated in the FEIR. *Topanga* does not suggest that such broad discussion is required. The FEIR is sufficient to disclose "the analytic route the . . . agency traveled from evidence to action." (*Topanga*, at p. 515.)

Under the circumstances, SCOPE has failed to show that resolution No. 08-101 contains insufficient analysis of its conclusions regarding the project's impact on climate change. SCOPE is asking more than is legally required. (*Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1030 [185 Cal.Rptr. 41] (*Village Laguna*).)[4]

---

[3] For the first time on appeal SCOPE argues that several specific additional measures set forth in the Attorney General letter could have reduced the project's environmental impacts, such as parking fees to encourage public transportation; solar photo voltaic cells to generate electricity; and offsite mitigation measures such as urban tree planning, manure management, and reductions in nitrogen fertilizer use. We note that the latter two examples do not relate to the cumulative impact from vehicles and transportation, which was the only climate change impact the city found to be significant—and CEQA does not require mitigation measures for impacts which are less than significant. (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1517 [258 Cal.Rptr. 267].) Further, because SCOPE did not draw the city's attention to these specific measures at the time that it raised its concerns at the administrative level, SCOPE cannot now complain that they were not specifically addressed. Under the circumstances, the city's general response to SCOPE's general concern was adequate. (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 378 [54 Cal.Rptr.3d 485] ["where a general comment is made, a general response is sufficient"].)

[4] In *Village Laguna*, four specific project alternatives were identified in the EIR to mitigate the environmental effects of the project. (*Village Laguna, supra,* 134 Cal.App.3d at p. 1028.) In making its finding on significant environmental effects, the board stated that only the " 'No

## D.  *Substantial evidence supports the finding*

SCOPE also argues that there is an absence of evidence to support the city's infeasibility determination. SCOPE frames the issue as "whether substantial evidence supports the City's finding that the Project's significant cumulative impact on climate change is unavoidable." Again, SCOPE complains of the city's failure to consider requiring the mitigation measures set forth in the Attorney General comment letter.

As explained above, SCOPE did not ask the city to consider any specific mitigation measure. Thus, SCOPE's vague claim regarding insufficient evidence is difficult to address. As to SCOPE's claim that the city failed to explain why additional mitigation measures, including those listed in the Attorney General letter, would be infeasible, we have already determined that such an explanation was not required under the circumstances.

SCOPE makes the broad claim that the city's finding that significant cumulative impact on climate change would be unavoidable was unsupported because neither the city's findings nor the FEIR contained *any* facts or analysis to support this conclusion. This claim is demonstrably incorrect.

As explained above, during the project approval process, the EIR's global climate change analysis was prepared in accordance with a technical advisory prepared by the OPR in June 2008. (<http://opr.ca.gov/ceqa/pdfs/june08-ceqa.pdf> p. 5 [as of June 30, 2011].) This was one of the only documents providing guidance in this area at the time. It required agencies to undertake a three-step analysis: (1) identify and quantify the GHG emissions; (2) assess the significance of the impact on climate change; and (3) if the impact is found to be significant, identify alternatives and/or mitigation measures that will reduce the impact below significance.

The EIR's analysis followed these three steps. First, the EIR contains a lengthy discussion of the various GHG emissions and the environmental and regulatory mandates. The EIR calculated the current GHG emissions and used that as a baseline for evaluating the project's impacts. The EIR then quantified the GHG emissions from the project operations and construction activities. The city found that GHG impacts with respect to scope 1 and scope

Development' " alternative could mitigate those effects and that this alternative was not economically feasible. (*Id.* at p. 1033.) The court found that this conclusion was lacking in two respects: "there is no discussion of the other EIR alternatives and there is no explanation of why the alternative that is mentioned is economically infeasible." (*Id.* at p. 1034.) Thus, the agency's findings were found to be inadequate because they failed to discuss alternatives specifically raised in the EIR. The case does not require, as SCOPE suggests, that every conceivable alternative be specifically discussed and rejected, regardless of its feasibility.

2 emissions were insignificant—a finding that SCOPE does not challenge. CEQA does not require the consideration of mitigation measures for insignificant impacts. (*San Franciscans for Reasonable Growth v. City and County of San Francisco, supra*, 209 Cal.App.3d at p. 1517; Pub. Resources Code, §§ 21100, subd. (b)(3), 21150.) GHG impacts were significant only with respect to scope 3 emissions (vehicles and transportation).

With respect to the scope 3 emissions, the EIR pointed out that "[t]he emissions from vehicle exhaust are controlled by the State and Federal governments and are outside the control of this project." The EIR noted that no thresholds of significance had been established by the OPR, the State Air Resources Board, or the Southern California air quality management district. However, the EIR concluded that "it is likely that if a significance threshold were adopted, project-related scope 3 GHG emissions would exceed the proposed emissions threshold due to the scale of the proposed project." The EIR pointed out that transportation sources represent over 40 percent of the state's emissions and the project would contribute significantly to this sector. Therefore, the EIR concluded, even with all feasible mitigation measures incorporated, the project's scope 3 emissions would cause a significant and unavoidable cumulative impact.

Traffic mitigation measures designed to minimize the project's impact on the flow of traffic were set forth in section 5.4 of the September 2008 EIR. This report set forth a detailed description of the existing roadway system, existing traffic volumes, and maps of the primary affected intersections. Mitigation measures TR1 through TR8 discussed the addition of traffic lanes to ease the flow of traffic around the project site. "By improving the flow of traffic, fewer greenhouse gases would be emitted from vehicles, thus further reducing greenhouse gas emissions." Two proposed bus stops would allow the public to access the hospital through public transportation.

In addition to these traffic mitigation measures, real parties in interest point out that the city was required to comply with new standards requiring, among other things, that the project comply with the city's sustainable policies as well as the city's transportation demand management (TDM) program, which is designed to reduce the number of motor vehicle trips and/or the length of the trips. In particular, the project was consistent with the city's requirements for the construction of bus turnouts, efficient site design for both motorists and pedestrians, adequate parking for vehicles and bicycles, and other conditions that promote a reduction in vehicle miles traveled. Furthermore, by locating the medical office buildings at the hospital campus, the project reduces the amount of vehicle trips by 20 percent over the baseline. The city's reliance on existing standards is sufficient under CEQA. (*Tracy First v. City of Tracy, supra*, 177 Cal.App.4th at pp. 933–934 (*Tracy First*).)

■ We must uphold the agency action " ' "if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA." ' " (*Tracy First, supra,* 177 Cal.App.4th at p. 934.) " ' "CEQA requires . . . a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." [Citation.]' " (*Ibid.*) Substantial evidence, described above, supported the city's determination that complete mitigation of the project's cumulative impact on climate change is infeasible.[5]

## IV. *Health and welfare of neighboring residents*

SCOPE next argues that the city council abused its discretion by finding that the project will not detrimentally affect the health and welfare of neighboring residents. Specifically, SCOPE argues that the city impermissibly engaged in a balancing of the project's perceived benefits against its adverse impacts on neighboring residents. SCOPE insists that the city's findings must be set aside because the city failed to proceed in the manner required by law.

The City of Santa Clarita's UDC requires that the city find that a proposed development will not "Adversely affect the health, peace, comfort, or welfare of persons residing or working in the surrounding area." (UDC, § 17.03.010, subd. E.3.a.) The city is also required to make a finding that "the location, size, design, and operating characteristics of the proposed use will be compatible with and will not adversely affect or be materially detrimental to adjacent uses, residents, buildings, structures, or natural resources . . . ." (UDC, § 17.03.025, subd. G.2.)

Finding 3.a, set forth in ordinance No. 08-17, specified that the development agreement between real parties in interest and the city will not adversely affect the health, peace, comfort, or welfare of persons residing or working in the surrounding area. The ordinance went on to explain that this finding was described more fully in the EIR, and that "the operational characteristics of the hospital campus will not change substantially." In addition, the plan was designed to "create a visually cohesive and operationally organized and successful medical campus that balances the needs for

---

[5] *City of Marina* is distinguishable. There, the trustees of California State University found that they could not feasibly mitigate the environmental effects of their plan to expand a campus. The trustees' decision was based on their legal determination that they were unable to contribute funds for mitigation purposes; thus, mitigation was "legally infeasible." (*City of Marina, supra,* 39 Cal.4th at p. 356.) The Supreme Court disagreed, explaining that the trustees misinterpreted the California Constitution and relevant case law. (*Id.* at pp. 356–357.) The high court found that the trustees' statement of overriding consideration was invalid due to its conclusion that "the Trustees have abused their discretion in determining that CSUMB's remaining effects cannot feasibly be mitigated . . . ." (*Id.* at p. 368.) The case does not suggest that there is insufficient evidence to support the infeasibility determination under the circumstances of this case.

medical service expansion with the need to preserve the character of the . . . neighborhoods that surround this regional services institution."

Finding 3.b specified that the development agreement would not be materially detrimental to the use, enjoyment, or valuation of property of other persons located in the vicinity of the site. The ordinance explained that the proposed plan "has been designed to avoid a significant alteration of views from surrounding areas" and that "the project is expected to have a less-than-significant adverse impact on the visual character of the area and the quality of the campus."

City Councilmember Marsha McLean challenged the city's finding set forth in finding 3.a. She stated, "How can this wording remain if . . . there are going to be things that cannot be mitigated but you're saying it's not going to affect the peace of the people during construction and everything else?" The city attorney responded, in part: "The test of whether something adversely affects the health, peace, comfort, or welfare of persons residing or working in the surrounding area, according to this paragraph, is measured not just by what impacts there are going to be on the surrounding neighborhood for construction, et cetera, but what benefits there are going to be in terms of the project when it's ultimately developed. And you have to balance those out, and that's—that's what that paragraph talks about."

Councilmember McLean then urged the city to at least use more honest language in describing the balancing of interests that was taking place. The city did not act on her suggestion.

SCOPE claims that the plain language of UDC section 17.03.010, subdivision E.3, does not permit the kind of balancing articulated by the city attorney. SCOPE argues that the general rule in California is that "evaluation of a project's detrimental impact on the welfare of the neighboring residents must be made solely based on the Project's potential adverse impacts, without regard to the project's potential public benefit."

SCOPE cites several cases in support of its position. However, these cases are not directly on point. (See *Lucas Valley Homeowners Assn. v. County of Marin* (1991) 233 Cal.App.3d 130, 155 [284 Cal.Rptr. 427] [articulating test as "whether these impacts are potentially detrimental or significant," but concluding "there indeed was substantial evidence in the whole record demonstrating the absence of detrimental traffic impacts"]; *J. L. Thomas, Inc. v. County of Los Angeles* (1991) 232 Cal.App.3d 916, 927–928 [283 Cal.Rptr. 815] [findings in support of denial of CUP were irrelevant to the criteria set forth in the county code]; *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 337 [25 Cal.Rptr.2d 842] [denial of land use

permit properly based on testimony from neighboring property owners]; *Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963 [31 Cal.Rptr.2d 1] [city's determination that proposed building would be detrimental to the public welfare upheld based on objections of neighboring property owners]; *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1213–1216 [30 Cal.Rptr.2d 95] [inadequacy of a single finding does not undermine denial of permit where other adequate findings were made].) Because these cases do not address the propriety of balancing a project's perceived benefits against its adverse impacts on neighboring residents, they do not convince us that the city's actions were improper. " 'Cases are not authority for propositions not considered.' [Citation.]" (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1102 [125 Cal.Rptr.2d 12].)

■ Neither party argues that the relevant UDC sections are ambiguous, therefore we restrict our analysis to the plain language of those ordinances. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) The plain language of UDC section 17.03.010, subdivision E.3, does not foreclose the type of balancing that the city engaged in. The section reads:

"E. Findings. The Planning Commission may recommend and the City Council may grant a development agreement prescribed by this section, as applied for or in a modified form, if, on the basis of the application and the evidence submitted, the applicant substantiates, to the satisfaction of the Commission and the Council, the following facts: [¶] . . . [¶]

"3. That the proposed development agreement will not:

"a. Adversely affect the health, peace, comfort, or welfare of persons residing or working in the surrounding area; or

"b. Be materially detrimental to the use, enjoyment, or valuation of property of other persons located in the vicinity of the site; or

"c. Jeopardize, endanger or otherwise constitute a menace to the public health, safety or general welfare." (Boldface omitted.)

■ The ordinance does not limit the factors that may be considered in making the finding at issue. Indeed, it seems logical that a decision as to whether a project will adversely affect a community must necessarily include consideration of the project's benefits to that community.[6]

---

[6] The same analysis applies to the plain language of UDC section 17.03.025, subdivision G, which reads, in relevant part: "Findings. The Council shall make the following findings for the approval of a master plan: [¶] . . . [¶] 2. That the location, size, design, and operating

In addition, as the trial court pointed out, an agency's view of the meaning and scope of its own ordinance is entitled to great weight "unless it is clearly erroneous or unauthorized." (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1015 [100 Cal.Rptr.2d 413] (*City of Davis*).) Here, the city's decision to weigh the benefits of the project in reaching its decision regarding the adverse effects of the project is not clearly erroneous nor is it specifically unauthorized. Because the city's actions were consistent with the ordinance, we decline to find error.[7]

Real parties in interest cite examples of cases where an agency's actions in balancing the benefits versus the detriments of a project have been upheld in similar situations. In *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 584 [18 Cal.Rptr.3d 814], the petitioners appealed from a denial of their writ of mandate challenging the construction of a housing complex. The city had determined that the project would not be detrimental to the adjacent properties, surrounding areas or the general welfare of the city because, among other things, the demolition would remove a vacant commercial building that had become a nuisance. As to concerns regarding sunlight, the city concluded, " 'any detriment resulting from the shadowing that will be created by the project is outweighed by the benefit of providing 40 additional dwelling units including 39 reserved for low and very-low income senior households.' " (*Id.* at p. 585.) While the balancing that the city engaged in was not specifically challenged, denial of the petitioners' writ, on this and other grounds, was affirmed. Similarly, in *Schumm v. Board of Supervisors* (1956) 140 Cal.App.2d 874 [295 P.2d 934] (*Schumm*), the county's determination that a clubhouse and swimming pool would not be detrimental to the surrounding community was based on the following facts: "that the area is

characteristics of the proposed use will be compatible with and will not adversely affect or be materially detrimental to adjacent uses, residents, buildings, structures, or natural resources . . . ." (Boldface omitted.) The plain language of this statute, like the language of UDC section 17.03.010, subdivision E.3, does not foreclose consideration of the benefits of the plan when making a determination of adverse effects. Instead, both statutes use broad language which does not suggest any restrictions on the type of evidence which may be considered in making this decision.

[7] SCOPE attempts to distinguish *City of Davis*. Citing *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1388 [241 Cal.Rptr. 67, 743 P.2d 1323] (*Dyna-Med*), SCOPE argues that an administrative agency's construction of a new enactment is entitled to great weight only if the interpretation is "contemporaneous" with the enactment. In *Dyna-Med*, there was a 20-year gap between the date of the statute's enactment and the promulgation of the regulation. Similarly, because the city's interpretation of the UDC was not contemporaneous with the UDC's enactment, SCOPE argues, it is not entitled to great weight. We reject this argument, as SCOPE has not sufficiently established the meaning of the term "contemporaneous" within *Dyna-Med* or provided any comparable dates as to the passage of the UDC as compared with the city's interpretation. Nor does SCOPE establish that this is the first time that the city has interpreted the UDC to permit the type of balancing that it engaged in here. Given the lack of analysis that SCOPE has provided, we decline to find relevant the distinction SCOPE advocates.

relatively uninhabited, that similar uses had already been granted, that the clubhouse, swimming pool and landscaping will be a beneficial improvement, and that the proposed recreational activities, including the use by the character-building Boy Scouts, would be beneficial to the public welfare." (*Id.* at p. 879.) The Court of Appeal, acknowledging that its role was limited to determining whether the municipal body acted within the limits of its power and discretion, rejected the petitioners' claim of lack of substantial evidence and upheld the county's decision. (*Id.* at pp. 880–881.)

The plain language of the UDC does not foreclose a balancing of the benefits versus the detriments of a project when determining adverse effects. In addition, the cases described above support real parties' position that such balancing is acceptable. As explained in *Schumm, supra,* 140 Cal.App.2d at pages 880–881, our role is limited to a determination of whether the agency acted within the limits of its power and discretion. (See also Pub. Resources Code, § 21168.5 [abuse of discretion may be found only if the agency "has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence"].) We decline to find that the city exceeded its authority in balancing the project's perceived benefits against its adverse impacts on neighboring residents.

Nor do we find the city's findings to be "deceptive" on the ground that the city did not adequately disclose the balancing process that it undertook in reaching its conclusion. The findings set forth in ordinance No. 08-17 disclose that the agency took into account the benefits of the proposed project, specifying that "the availability of emergency medical services, emergency helicopter transport to and from the medical campus, and expanded inpatient and outpatient medical care will provide a beneficial service to the Santa Clarita Valley on a regional level that promotes the public health, safety and well being of the community." This, along with the city attorney's comments at the public hearing, is sufficient to inform the public that consideration of the project's benefits contributed to the city's decision.

■ Finally, SCOPE complains that the city's explanation of its finding "never mentions the noise, dust and pollution that will plague the neighborhood for the 15 year duration of the Master Plan." First, we note that SCOPE has not provided a citation to the administrative record showing evidence supporting this prediction. Further, the UDC does not require that the city discuss in detail every factor—for or against—that weighs into its ultimate findings. Therefore we decline to set aside the city's findings on this ground.

## DISPOSITION

The judgment is affirmed. Real parties in interest are entitled to their costs on appeal.

Doi Todd, Acting P. J., and Ashmann-Gerst, J., concurred.