Filed 2/18/14  Highland Park Heritage Trust v. City of Los Angeles CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| HIGHLAND PARK HERITAGE TRUST et al., | B242930 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS133020) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents; | |
| AUTRY NATIONAL CENTER OF THE AMERICAN WEST, | |
| Real Party in Interest. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge.  Affirmed.

Otten & Joyce, Victor J. Otten, Brigid Joyce for Plaintiffs and Appellants.

Carmen Trutanich, City Attorney, Timothy McWilliams for Defendants and Respondents.

Alston & Bird, Edward J. Casey, Neal P. Maguire for Real Party in Interest.

_____

Highland Park Heritage Trust and Mount Washington Homeowners Alliance (collectively, Petitioners) appeal from the judgment denying their combined petition for writ of mandate and complaint for injunctive relief in which they sought to set aside the decision of the Los Angeles City Council (City Council) consenting to the internal remodeling project (Project) for the Gene Autry Western Heritage Museum (Autry Museum) and adopting the findings of the City of Los Angeles Board of Recreation and Parks Commissioners (R&P Board), including the finding the Project is exempt from CEQA.[1]

The Real Party in Interest is the Autry National Center of the American West (Autry), which currently operates the Autry Museum on leased land in Griffith Park and the Southwest Museum in the Mount Washington area of the City of Los Angeles (City).[2] Pursuant to a private merger in 2003, the financially and physically unsound Southwest Museum became part of the Autry operations.

In April 2011, the State of California (State) awarded Autry a grant of $6,593,463 ($6.6 million) to fund the redesign of the interior of the Autry Museum and for installation of new exhibits. In about May 2011, Autry submitted a proposal to the City of Los Angeles Department of Recreation and Parks (Department) to remodel approximately 18,000 of the total 48,230 square feet of the first floor of the Autry Museum. This 18,000 square feet was used primarily for exhibits but included about 2,500 square feet of collections storage and restrooms. The remodeling would take place within the museum's existing footprint without alteration to building's exterior.

---

[1] CEQA is the acronym for the California Environmental Quality Act, which is set forth in Public Resources Code section 21000 et seq. All further section references are to this code unless otherwise indicated.

[2] Formerly, Autry was known as The Autry Western Heritage Museum and was formerly known as the Gene Autry Western Heritage Museum. As of the March 4, 2003 merger, Autry became the "Autry National Center of the American West," which included the Autry Western Heritage Museum and the Southwest Museum.

The nature of the remodeling would involve renovation of two galleries housing long-term exhibits ("First Californians" and "Dreamers, Doctors, Basketweavers") and the conversion of an existing exhibit ("Trails West") into a teaching garden displaying native flora and ecosystems depicted in the planned First Californians exhibit. Additionally, the restrooms and a certain outdoor area would be remodeled.

The R&P Board approved the remodeling Project; granted its consent thereto to Autry under the City's ground lease with Autry; and found its consent was exempt from CEQA because the Project included only interior remodeling of the Autry Museum, an existing facility. The City Council rejected Petitioners' CEQA appeal (11-2 vote) and consented to the Project (10-3 vote).

Petitioners contend approval of this Project improperly furthers Autry's ultimate goal of obtaining piecemeal approval in violation of CEQA of a much more expansive project Autry appeared to have abandoned earlier. They also contend the Project is not exempt from CEQA and that the Project violates the Northeast Los Angeles Community Plan (NELA Community Plan) by usurping the artifacts in the Southwest Museum collection (Collection) for the Autry Museum.

We affirm the judgment. The City did not abuse its discretion in approving the R&P Board decision that the Project did not have to comply with CEQA. The record does not support Petitioners' claim that the Project is merely a component piece of a much larger project which is subject to CEQA.[3] The Project is categorically exempt

---

[3]     The record on appeal consists in part of a copy of the certified reporter's transcript of the May 17, 2012 hearing before the superior court on a combined petition for writ of mandate and complaint for injunctive relief and two volumes of the Appellants' Appendix, which include pleadings and other documents in that proceeding.

The record also consists of a partially certified administrative record, lodged as volumes 1 through 33, which includes "the final index of the record" and "documents bates numbered AR001-AR125260," except for the "document labeled AR0006369 . . . found at Tab 180" and "any document bearing a control number prefix of CPC-2008-2548 or ENV-2008-2547," which documents are not properly part of this record, because "they neither pertain to the [P]roject challenged in this litigation, nor relate to a prior version of the [P]roject challenged in this litigation."

from CEQA without exception.  The City did not act in a manner contrary to law in consenting to the Project, which is not inconsistent with the NELA Community Plan.

## BACKGROUND

**1.      Merger of the Autry Museum and the Southwest Museum**

In 2003, Autry, a California nonprofit corporation, entered into an agreement with the Southwest Museum, then a nonprofit corporation, whereby the Southwest Museum would be merged with the Autry Museum and cease to exist as an independent entity. Autry operates the Autry Museum at its Griffith Park Campus and the Southwest Museum at its Arroyo Campus.

a.      *Southwest Museum and Its Collection*

"The approximate 12-acre Arroyo Campus is located within the Mount Washington area of the City. . ." and "includes the Southwest Museum Building, the Casa de Adobe, and the Braun Library."  Although the Southwest Museum Building and the Casa de Adobe are historical resources, the Braun Library is not.  "The site includes a steeply sloped hillside that extends upward in a northerly direction from the site entry on Museum Drive at the foot of the hill.  In addition, the Arroyo Campus includes roughly 33,000 square feet of building area."

"The . . . Collection totals nearly 250,000 archaeological and ethnographic items from all parts of North America.  The Collection is particularly strong in material from the Great Plains, Southwest, California, and the Northwest Coast.  In some categories such as Native American baskets as well as ceramics, kachinas, and textiles, the

---

We deem the administrative record also to include the certified reporter's transcript of the May 20, 2011 hearing before the R&P Board, at which time that Board approved the Project.  This copy is located after the last tab, which is blank, in volume 33 of the administrative record.  The partially certified administrative record as so augmented is sufficient for our review**.**  (*Elizabeth D. v. Zolin* (1993) 21 Cal.App.4th 347; cf. *Buckhart v. San Francisco Residential Rent etc. Bd.* (1988) 197 Cal.App.3d 1032.)

We earlier denied Petitioners' request for judicial notice filed March 21, 2013.  On August 9, 2013, they filed another request for judicial notice and a motion to take new evidence.  We deny both this judicial notice request and the motion.

4

Collection is unsurpassed.  In addition, the Collection includes 125,000 archeological items, 6,000 Spanish Colonial artifacts, and 4,000 two-dimensional works of art."[4]

      b.     *Goal of Merger*

"With regard to the merger, the goal was to manifest a general commitment to blend aspects of the Southwest and Autry museums to include the shared use of facilities, preservation of the collections, integration and interaction of staff, and the development of exhibitions and programs.  In furtherance of this goal, the Autry included the Southwest as part of its master planning process.  The merger did not provide a definite plan for future development or expansion of either site, nor did it manifest a 'promise' to construct facilities at Griffith Park adjacent to existing buildings, or to maintain all artifacts and displays at the Southwest [Museum]."

      c.     *Southwest Museum and Its Collection Following Merger*

Upon the 2003 merger, Autry discovered "the Southwest Museum [C]ollection was in danger because of harmful storage conditions, pest infestations and building leaks.  Artifacts were overcrowded and inaccessible."  The need "to repair structural damage due to the 1994 Northridge earthquake" required the Autry "to move 230,000 [artifacts] out of the main tower, the Caracol Tower."

In its Southwest Museum rehabilitation study report, Autry stated, "we do not believe it is economically feasible to operate the site exclusively as a museum."  The record reflects Autry did spend over $7 million to restore and preserve the Collection and other monies to repair the museum itself.  By Resolution dated May 23, 2007, Autry set forth its decision to remove the Collection from the Arroyo Campus.

---

[4]     For ease of discussion, we refer to an item in the Collection as an artifact and to more than one item or collectively to all of the items as "artifacts."  An "artifact" signifies "an object made by a human being, typically one of cultural or historical interest" (oxforddictionaries.com/us/ . . . /artifact) or "[a]n object made or modified by human workmanship, as opposed to one formed by natural processes."  (Oxford English Dict. (3d ed. 2008).)

5

**2.   The Earlier Expansive Project**

   a.   *Nature and Scope of Earlier Expansive Project*

Prior to this Project, Autry had attempted to accomplish a project which would have extended the external footprint of the Autry Museum expansively. After Autry applied for consent to this project, a draft environmental impact report (DEIR) was prepared, and in 2008, a final environmental impact report (FEIR) was prepared under CEQA. Autry subsequently withdrew its application for that project (Earlier Expansive Project or 2008 Project) due to public controversy and delays in obtaining its approval.

   (1)  Consent by R&P Board and City Prerequisite to Project

The Autry Museum is located in Griffith Park on land leased from the City. Pursuant to the lease, Autry was required to obtain the consent of the City for any remodeling of the museum valued at more than $25,000. As a precursor to such consent, Autry first had to obtain the consent of the R&P Board, whose function for the City included overseeing lands leased by the City for public recreation and parks purposes.[5]

   (2)  DEIR Prepared

In August 2007, with regard to the Earlier Expansive Project, the Department, as the lead agency, prepared a DEIR under CEQA and the guidelines promulgated under CEQA (Guidelines).[6]

The DEIR gave this description of the Earlier Expansive Project: "To assist in implementing its mission to 'explore the experiences and perceptions of the diverse peoples of the American West,' the Autry . . . proposes" the following improvements to its "Griffith Park Campus[, which] includes the Autry . . . Museum . . . and the Institute

---

[5]   The "Department of Recreations and Parks shall operate, manage and control all property now or hereafter owned or controlled by the City . . . for public recreation, including parks, and shall have power in the name of the City . . . to acquire and take by purchase, lease, condemnation, gift, in trust or otherwise, any and all property necessary or convenient for recreation, including park purposes."

[6]   These Guidelines are set forth in the California Code of Regulations, title 14, division 6, chapter 3, section 15000 et seq.

for the Study of the American West. The project would renovate and modernize certain portions of the Existing Griffith Park Campus in two development phases. The key project features include increasing the building space within the Campus by 129,000 square feet, renovating the exterior landscape areas, and enhancing vehicle and pedestrian circulation and parking amenities. These improvements would allow the Autry . . . to establish its Griffith Park Campus as the premier interpretive site for the exhibitions of the American West; to implement its previously approved plan to store its collections in a location with museum standard-of-care controls and appropriate physical storage conditions in a facility such as the project site; to showcase the internal workings of the Campus (e.g., visible storage of collections and staff areas); to provide additional gallery and presentation areas for the public; to enhance its research and education programs; and to enhance the Campus as a cultural resource."

The DEIR identified and discussed five specific alternatives to reduce or avoid significant effects, including "Alternative E," which would switch the project site from the Griffith Park Campus to the "Arroyo Campus," which included the Southwest Museum and Casa de Adobe.

The Department noted, "[t]he Arroyo Campus is not part of the project" and that Autry's "decision to expand its Griffith Park Campus is independent of any decision as to how to reuse the Arroyo Campus. [Autry] has previously resolved to move the Southwest [Museum] Collection, regardless of whether the expansion occurs at the Griffith Park Campus." It concluded, "while the Arroyo Campus does include known historic resources, such as the Southwest Museum Building and the Casa de Adobe, . . . these resources would not be impacted by the project.[7]

---

[7]    In reaching this conclusion, the Department explained what constituted a significant impact on a historical resource and then explained why the Earlier Expansive Project would not give rise to such an impact with respect to the Southwest Museum and its Collection. Citing section 21084.1, Guidelines section 15064.5, and the "City of Los Angeles CEQA Thresholds Guide (2006)," the Department stated: "[A] project has a significant impact on a historical resource if it would result in a substantial adverse change in the significance of an historical resource. 'Substantial adverse change in the

7

"With regard to the Southwest [Museum] Collection within the Arroyo Campus site, the movement of the Collection [to the Griffith Park Campus] is not a 'project' under CEQA. Furthermore, even if the . . . Collection could be considered part of a project's environment, the proposed project would not significantly impair the . . . Collection. Specifically, the proposed project would not in any way 'materially impair' the . . . Collection." On the contrary, such relocation would provide the Collection with "the best care available while achieving a higher public display value than if they were to remain at the Arroyo Campus." The project would provide "a state-of-the-art facility in which the Collection can be properly cared for while providing greater public access to the Collection—most of which has been hidden from public view for decades due to a lack of space in which to properly display and care for these artifacts. Currently, the inadequate exhibit space in the Southwest Museum Building requires 98 percent of the 250,000 items in the Collection to remain in storage at any given time. The Collection is largely stored in the seven-story Caracol Tower, which is inappropriate in size and condition for the conservation, documentation, and scholarly requirements of the Collection. These deficiencies put the stored collections at risk."

The Department found the potential significant adverse impacts of expansion of the Arroyo Campus overwhelmed those posed by going forward with the project at the Griffith Park Campus and concluded the expansion of the Arroyo Campus alternative "would not be the environmentally superior alternative under CEQA." The Department rejected the Arroyo Campus alternative.

significance of an historical resource means physical demolition' or other adverse effects, such that the significance of the historical resource 'would be materially impaired.' Material impairment occurs when a project alters or destroys 'those physical characteristics of an historical resource that convey its historical significance and that justify its inclusion' in a State or local historic registry. Since there is nothing to demonstrate that the proposed project would in any way 'materially impair' the known historic resources at the Arroyo Campus, no potential impacts would occur."

(3) FEIR Prepared

In August 2008, an FEIR was prepared.**8**  The Department again rejected the "Alternative E—Expansion at the Arroyo Campus" for the same reasons set forth in the draft EIR, plus the reason "development at the Arroyo Campus site could have a significant noise impact during construction."

b.      *Autry's Abandonment of Earlier Expansive Project*

In a letter dated August 10, 2009, to the City, Autry withdrew its request for a lease amendment and its applications on file for the Earlier Expansive Project.  Autry explained the City Council, through its Board of Referred Powers, did not intend to hold a hearing on its proposed lease amendment until "some undefined date after August 31," and Autry was "now out of time."

In a letter dated August 25, 2009, the City Department of Planning advised Autry that "the Director of Planning hereby terminates all proceedings relative to [the Earlier Expansive Project]" and after noting "the City Planning Commission took no formal action on this application," advised if Autry wished "to pursue this matter in the future, it will be necessary . . . to file a new application and pay the required fees."

**3.      "Open Autry" Plan Discarded and Partial First Floor Project Adopted**

a.      *"Open Autry" Plan to Remodel Entire First Floor Discarded*

In spring of  2010, Autry considered "an ambitious plan… to redo the entire first floor [of the Autry Museum], adding new galleries and rental space," sometimes referred to as an "Open Autry" design.   In a press release issued in June 2010, Autry commented

---

**8**      The FEIR contained a specific section setting forth certain corrections and additions to the draft EIR "based on comments received from the public and agencies, and other items requiring updating and/or corrections."  On August 18, 2008, a public hearing was held by the Department regarding the FEIR.  In January 2009, a document entitled "Errata to Final Environmental Impact Report" was prepared by the Department, which contained a section on "additional corrections and additions to the draft EIR"; "additional responses to comments" following preparation of the FEIR; an "Updated Mitigation Monitoring and Reporting Program"; and three appendices.  The Department concluded recirculation of the FEIR was not necessary.

9

on its "Open Autry" design. Autry, however, ultimately decided not to proceed with this plan for the redesign of the entire first floor. At a meeting in May 2010, Autry discussed the "Open Autry" plan with Department staff; however, Autry did not submit a formal development application or seek written consent therefor from the R&P Board or City.[9]

b.    *Project to Remodel Portion of First Floor Adopted*

In spring of 2010, the State issued a request for proposals regarding its Proposition 84 Natural Education Facilities Grant Program. Autry submitted a proposal for a grant.[10] Autry's adopted plan was to redesign 18,000 square feet of the first floor, which is this Project.

**4.    This Project**

a.    *Nature and Scope of Project*

On June 21, 2011, the Department filed an NOE with the City listing the Project's exempt status as a "categorical exemption." The claim of exemption was justified on the ground "[t]he [P]roject involves interior and exterior alterations to established and discrete areas of an existing facility, which are fully developed within the larger environment of parks or recreation centers, where such modifications are essentially a rearrangement (rather than an additive function) such as might occur at a museum, and will not increase the size or expand the use of the facility."

The Project title was "AUTRY NATIONAL CENTER (Griffith Park)—Facility Remodeling of Exhibit Space for Interpreting Native American Environmental Stewardship." Autry supplied this description of the nature, purpose, and beneficiaries of the Project: "The proposed [P]roject will . . . create two exhibit galleries and an outdoor

---

[9]    On June 25, 2010, Department staff approved a Notice of Exemption (NOE). As Petitioners concede, this approval is inconsequential, because the lease required the consent of the R&P Board itself.

[10]    As part of the grant application process, Autry needed a "comfort letter" from the R&P Board to the effect that the lease likely would be extended at the expiration of its term in 2037. The Board provided Autry with the required letter.

10

teaching garden devoted to the indigenous peoples of California, their relationship to the natural environment, and key stewardship practices they have employed in sustaining their traditions and lifeways.  The project will include reconfiguration of two existing museum galleries to house the California Indian exhibits, as well as the conversion of an existing exterior interpretive space into the Native California teaching garden.  The [p]roject will also include the renovation of existing restrooms common to each of these interpretive areas.  All remodeling work will be accomplished within the museum's existing footprint and no exterior walls of the museum building will be expanded.  The patrons of the Autry . . . [M]useum and Griffith Park will be the beneficiaries of the [p]roject."

b.　　　*Project Funded by $6.6 Million Proposition 84 State Grant*

In April 2011, the State awarded Autry a grant in the amount of $6.6 million to fund the redesign of the interior of the Griffith Park Museum and the installation of new exhibits.  This grant fund could not be used for any other purpose or place.

**5.　　R&P Board's Finding Project CEQA Exempt and Consent to Project**

On May 20, 2011, the R&P Board adopted the recommendation of the General Manager to approve the Project without additional CEQA documentation, finding the Project was exempt under CEQA and that an NOE already had been filed on June 25, 2010.

On May 27, 2011, Councilman Jose Huizar made a motion, which was seconded by Councilman Ed P. Reyes, pursuant to Section 245 of the City Charter (Section 245 motion) for the City Council to assert jurisdiction over the R&P Board's May 20, 2011 action approving the Project and, upon asserting jurisdiction, to refer the matter to the Arts, Parks, Health and Aging Committee (Committee) for further review.

At its May 31, 2011 meeting, the City Council, under Council File No. 11-0884, adopted the Section 245 motion and referred the matter to the Committee.

On June 3, 2011, the Committee held a public hearing on the propriety of the R&P Board's approval of the Project and to decide whether to recommend that the City

11

Council approve or disapprove the Board's action.[11] As a preliminary matter, the City Attorney explained that pursuant to its ground lease with the City, Autry first had to obtain the consent of the Board to any proposed modifications valued in excess of $25,000 to the structure of the Autry Museum or in excess of $5,000 to the Museum's exterior. An Autry attorney argued the R&P Board's approval of the Project was not a discretionary decision, because the lease provided "consent shall not be unreasonably [with]held"; "the grounds for withholding would be very, very narrow, because the work is on the inside of the building and the building is owned solely by the Autry." He added that so long as the Project is "consistent with use, there are no grounds to withhold" consent.

During the public comment phase of the meeting, a common theme was Autry was obligated— but was remiss in failing— to restore the Southwest Museum to its previous fully operational status as an ongoing museum. Daniel E. Wright, President of Mount Washington Homeowners Alliance, challenged the project as violating the NELA Community Plan portion of the City's General Plan. He argued, aside from the CEQA issues, approval of the Project is a discretionary decision, which must be supported by a finding of consistency with the General Plan, and the City cannot make such a finding, "because this particular [P]roject propose[s] to remove the signature exhibits of the [Collection] [away from] the Southwest Museum [and] out of Mount Washington in violation of the General Plan's" directive for "the preservation of the present location of the Southwest Museum at its current location on Mount Washington."

At the conclusion of the public comment portion of the hearing, Councilman Reyes urged that the Committee recommend disapproval of the R&P Board's action "and have full council" engage in a "healthy debate" as to the relevancy of the Southwest

---

[11] The City attorney advised "[a] [section 245] motion allows the city council to assert jurisdiction over an action that [the R&P] Board took." The Board's action is final if the City Council does not act within 25 days or approves the Board's action. If the City Council disapproves the Board's action, the matter would be returned to the Board for reconsideration in light of such disapproval.

Museum issues. Chairman Tom LaBonge disagreed and continued the matter for the Committee's "regular meeting" to obtain advice from the City Attorney.

On June 20, 2011, the Committee conducted a public hearing regarding the appeal filed by Mount Washington Homeowners Alliance challenging the R&P Board's finding of CEQA exemption for the Project. At the hearing, the Department announced its determination that the Project qualified as a "Class 1 Categorical Exclusion, and that there were no exceptions to the exemption since the [P]roject only included modifications to two galleries, which did not constitute an expansion of use (no additional square footage was added to the building.)"[12] After providing Mr. Wright and Autry an opportunity to present their respective cases and allowing extensive public comment, the Committee, by a vote of 2 to 1, found the evidence supported R&P Board's finding that the Project was exempt from CEQA and recommended the City Council sustain the Board's approval of the Project.

**6. City Council's Consent to Project and Denial of R&P Board Appeal**

At a public meeting held on June 21, 2011, under Council File No. 11-0928, the City Council adopted the recommendations in the report of the Committee that the City Council: (1) find the Project was exempt from the provisions of CEQA; (2) adopt the findings of the R&P Board and the Department as its findings; and (3) resolve to deny the appeal filed by Daniel Wright on behalf of the Mount Washington Homeowners Alliance and Charles Fisher, individually, and thereby sustain and find the Project was exempt from CEQA. The City Council, by a vote of 10 to 3, sustained the R&P Board's approval of the Project and denied the appeal.

---

[12] Paul Davis, a Department staff member, explained "a Class 1 categorical exclusion . . . deals with interior/exterior alterations to an already existing facility with such things as interior partitions, plumbing, electrical conveyances, and other kinds of modifications, which essentially result in a rearrangement of the interior of the building." He further explained that no issue of exceptions to the exemption existed, because "carrying out this interior improvement work at the Griffith Park facility will not cause any physical [change] to the Southwest facility. CEQA is about physical changes. There will be none to the Southwest by virtue of carrying out the interior improvement work at the Griffith Park facility."

## PROCEDURAL SUMMARY

### 1.    The Pleadings and Parties

#### a.    *Pleadings*

On July 26, 2011, Petitioners filed a pleading entitled "verified petition for writ of mandate and complaint for injunctive relief" (Petition), which set forth two causes of action. In the first cause of action, they alleged the Project was approved in violation of CEQA and its Guidelines, because the Project is "only a limited portion of" and a "piecemealed" part of the whole project Autry seeks to accomplish. Petitioners requested a writ of mandate directing the City to vacate and set aside the NOE issued June 21, 2011, "and all related Project approvals and to prepare an Initial Study" under CEQA.

In the second cause of action, they alleged approval of the Project violated "State Planning and Zoning Laws," specifically the NELA Community Plan. Among "specific provisions protecting the Southwest Museum," the plan "includes the following objective: 'Support the Southwest Museum as a cultural resource, encourage expansion both on and off site, and preserve its present location in Mt. Washington.'" "City agencies [thus] are required to only take actions that assure the Southwest Museum's land use as a museum will be preserved at Mount Washington." They further alleged pursuant to "Section 554 of the City Charter, the General Plan" "committed **all City agencies** to maintaining the Southwest Museum's location as a museum on Mount Washington." "In approving the Project, "Respondents did not proceed in the manner required by the State planning and zoning laws and the City's Charter," because neither they nor the Department considered that "the Project violates the General Plan as it relates to maintaining the Southwest Museum at its present location," which conclusion is compelled, because "the underlying motive of the Autry is to move all collections of the Southwest Museum site and to dispose of" the Southwest Museum's designation as a "historic National Register of Historic Places building." In view of the above, Petitioners requested that the trial court "enjoin the Respondent City . . . its officers, employees, agents, boards, commissions and other subdivisions from issuing permits or other actions

14

to carry out the . . . [P]roject" and "Real Parties from undertaking any activities pursuant to the null and void Project approvals."

Respondents and Autry filed separate answers in which they generally denied Petitioners' material allegations and set forth affirmative defenses.

b.     *Parties*

"Many of the members of both [Petitioners] are homeowners who pay taxes that flow into the coffers of the City," and Petitioners claim "a direct interest in the . . . Project in Griffith Park[, because] their tax dollars are used to subsidize any Autry actions purported to be authorized by the City . . . under the terms of the lease agreement" between the City and Autry.

Petitioner Highland Park Heritage Trust, a California nonprofit corporation, is "a founding member of the 'Friends of the Southwest Museum Coalition[,' which consists] of almost 70 community-based, historic preservation, cultural, arts, civil rights, and certified neighborhood councils of the City . . . formed in 2003 when the Southwest Museum and Autry Museum entered into a merger and there was concern that Autry might attempt to move the Southwest Museum away from Mount Washington." "Its members include many historic preservation activists, environmental justice advocates, and individual residents from the Northeast areas of the City . . . who support work to preserve for future generations the significant historic resources contained in the Arroyo Seco, which includes the location "where Charles Fletcher Lummis, the founder of the Southwest Museum, built his Arroyo stone home by hand, and a place where he sited his lifetime achievement—the 1914 Southwest Museum building."

Petitioner Mount Washington Homeowners Alliance, which "represents the voice of about 700 member residents living within the boundaries of Mount Washington," also is a founding member of that coalition. It is "a California unincorporated association that engages in free speech advocacy and petitioning of government regarding land use, environmental, social, historic, and educational interests of households located with[in] the neighborhood of Mount Washington and its adjoining Arroyo Seco areas of Northeast Los Angeles."

15

Respondents are the City, its City Council, and its R&P Board.  The City "is a chartered municipal corporation of the State."  The Autry Museum is on land leased by the City.  Pursuant to this lease, Autry must obtain the consent of the R&P Board to proceed with its Project.  Autry sought and obtained consent to the Project from the R&P Board which also made the determination of CEQA exemption.  The City Council also granted its consent to Autry proceeding with the Project.

Autry is the real party in interest and came into existence as the "result of a merger between the Southwest Museum and the prior entity that owned and operated the Autry Museum."

## 2.	Statement of Decision and Judgment

In its statement of decision, the superior court addressed and rejected Petitioners' contentions "(1) the proposed . . . [P]roject for the Griffith Park Museum is an improper 'piecemealing' of a larger project for the Griffith Park Museum, (2) the [P]roject is not exempt from CEQA, and (3) the [P]roject violates the goals and policies of the City's General Plan and [NELA] Community Plan because the new galleries in the Griffith Park Museum will replace the Southwest Museum's galleries" regarding the artifacts and other items in the Collection.

After noting CEQA applies only to discretionary decisions, the court found, contrary to the claim of Autry and Respondents, approval of the Project, which would involve modifications to the Griffith Park Museum under the lease, would involve a discretionary, not a ministerial, act on the part of the City and concluded CEQA did apply under these circumstances.  The court reasoned:  "The City's decision to approve the remodeling under the lease could be ministerial only if its decision-making was based on fixed, preexisting standards.  There were no such standards.  There was no statute, ordinance, or regulation establishing the City's duty to approve Autry's [Project].  The City was bound only by its lease agreement, but the City is no different than any party to a contract.  A public agency is just as free to breach a contract during performance.

Having determined CEQA applied to the Project, the court noted that in *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263,  283-284, our Supreme Court

concluded a project was to be defined broadly to avoid "chopping [up of] a large project into many little ones" or "piecemealing" the project to avoid CEQA review. Mindful of this guidance, the superior court first found "[t]here is simply not substantial evidence to support a conclusion of project piecemealing." The court noted, "[a]ll of Petitioners' arguments are premised on the same focus: the whole of the project at issue is the 2008 [proposed] project to add 129,000 square feet of space to the Griffith Park Museum, and the remodeling [P]roject is just the beginning.

In finding this premise unsupportable, the court explained Autry had expressly stated that it has no future plans to add to or remodel the Griffith Park Museum."[13] Although acknowledging "such flat conclusions are not dispositive, and [the] real purpose or intent may be gleaned from its press releases or statements by management," the court added that examination of Autry's "statements about an expansive, $75 million project" in context reveals "Autry withdrew its [earlier, expansive] plans, largely due to the efforts of Petitioners and others, and its current plan is only a more modest remodeling project." The court further found the fact Autry "has consistently reduced its expansion plans" of 2005 to 2008, supports its "conclusion that no larger project is reasonably foreseeable" and the Project is in fact "the entire project." The court thus concluded "[t]he whole of the project is the . . . [P]roject presented to the City Council."

The court next found the City properly approved the Project, which approval is reflected in its 2011 NOE, as categorically exempt from CEQA. The court explained the Project, which "consists of an 18,000 square foot remodeling of area currently used primarily for exhibit space, and also including approximately 2,500 square feet of collections storage and the floor's restrooms . . . fits squarely within Guidelines section 15301" as "a 'Class 1' exemption for the minor alteration of an existing public structure, involving negligible expansion of use." The court added the conversion of "2,500 square

---

[13]    At the Petition hearing, Autry's attorney advised the record reflects "the Autry trustees . . . are not pursuing the rest of the redo of the interior first floor, because they rely on donations" and "they are not flush with cash."

17

feet of storage space to public gallery space is a negligible expansion of use," because "[t]he museum continues to be used as a museum" and "[t]o the extent it is not, the 2,500 square foot conversion qualifies as an addition to an existing structure within the limits of Guidelines section 15301(e)." The court also found the Project "fits within City CEQA Guidelines, art. III, § 1.a(1)'s exempt activity of . . . interior or internal modifications to established and discrete areas which are fully developed within the larger environment of a museum, where the development is essentially a rearrangement (rather than an additive function).

The court was not persuaded by Petitioners' contention that an exception existed pursuant to Guidelines section 15300.2. The court pointed out the burden fell to the party challenging the exemption to show by substantial evidence that an exception existed, e.g., the one under Guidelines section 15300.2, subdivision (c) for "unusual circumstances" which gave rise to a "reasonable possibility" that the activity will have a significant impact on the environment. Petitioners thus had to make a two-step showing of: (1) "unusual circumstances" existed; and then (2) a "reasonable possibility" the activity would have a significant impact on the environment.[14] Substantial evidence of such a "reasonable possibility" was required to take negate the exemption.

Applying these principles, the superior court concluded no exception applied. "First, there are no unusual circumstances in Autry's remodeling [P]roject. The renovations are common in nature." Also, Petitioners do not "show substantial evidence supporting a fair argument of significant environmental impact. They provide no analysis of the issue, stating only that the project will lead to significant cultural resource, land use, traffic, parking, and safety impacts, and citing to certain pages of the record. . . .

_____

[14] The court discussed *Berkeley Hillside Preservation v. City of Beverly Hills*, which Petitioners relied on for the proposition substantial evidence of a fair argument of a significant environmental impact was sufficient to support the exception without needing separately to analyze whether unusual circumstances existed. We note this decision is of no force or effect, because review was granted (S201116). (Cal. Rules of Court, rules 8.1105(e), 8.1115(d).)

18

This is insufficient to raise the issue" of significant environmental impacts. Moreover, "even if the issue were properly raised, Petitioners' citations do not support the argument."

The court pointed out Petitioners' "real contention" concerned the Project's anticipated exhibition of artifacts in the Collection at the Autry Museum. Although admitting the Project would not affect the Southwest Museum, they contended "'its exhibits and contents will be removed rendering the building useless as a historic location'" and effect "'the obliteration of a nationally significant museum'" in violation of "the City's General Plan and the [NELA] Community Plan."

In finding this contention to be unsuccessful, the court reasoned, "CEQA does not directly apply to cultural resources because social impacts are not the subject of CEQA," citing section 21080, subdivision (e)(2), and Petitioners failed to show the Project would have a significant impact on the environment, because it "may cause a substantial adverse change in the significance of an historical resource," citing section 21084.1. The court noted, "the [C]ollection of artifacts held by the Southwest Museum does not [itself[ qualify as an historical resource. Nor does it contribute to the historical significance of the Southwest Museum." Accordingly, "the movement of any portion of the [C]ollection cannot be considered to have a substantial adverse change in the historical significance of the Southwest Museum."

The court added, "the number of Southwest Museum artifacts which will be displayed at the Griffith Park Museum is actually modest. Counsel at hearing clarified that only one percent of the Southwest Museum's 250,000 piece [C]ollection (2,500 items) will be transferred for exhibition in the remodeled 'First Californians' and 'Dreamers, Doctors, and Basketweavers' galleries at the Griffith Park Museum. Thus, it is simply not true that the remodeling [P]roject will 'absorb and merge' the entirety of the Southwest Museum as was contended about the [proposed] 2008 project." Additionally, there would be no significant environmental land use impacts, as contended by Petitioners, because the Project "simply will not involve the wholesale movement of the . . . [C]ollection" from the Southwest Museum, "which is currently closed for all but a

19

few events." Finally, mere inconsistency between a general plan (or specific plan) and a project, much like a social or economic effect, does not by itself mandate a finding of significant environmental effect.[15]

As reflected in the judgment, the superior court found in favor of "the City [Respondents] and Autry for the reasons stated in the court's written decision" and entered judgment in their favor as "to Petitioners' Verified Petition for Writ of Mandamus; Complaint for Injunctive Relief."

## DISCUSSION

### I. CEQA

"'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." [Citation.]'" (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 926.)

Analysis of a proposed project pursuant to CEQA may be divided into a three-tier inquiry. The initial inquiry is whether CEQA applies to the proposed activity. "CEQA applies if the activity is a 'project' under the statutory definition, unless the project is exempt. [Citations.] 'If the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary.' [Citation.] In such cases, the agency may file a notice of CEQA exemption [i.e., NOE], if it chooses to do

---

[15] At the hearing on the Petition, the superior court asked what did the NELA Community Plan "have to do with this? It seems to me that the Griffith Park Museum is not in the northeast community. The [NELA Community Plan] is a zoning plan for that [northeast] area. I don't see what its policies have to do with changes to the Griffith Park Museum." Petitioners' counsel agreed with the court's assessment that their argument was not "a CEQA issue" but rather "a separate land use issue, that they were violating the general plan and the community plan." Autry's counsel agreed with the court's comment that how could someone "violate the community plan when [that person was] not in that community [but rather] in a different community.

20

so.  [Citations.]"**16**  (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1373 (*San Lorenzo*).)

On the other hand, "[i]f the project is not exempt—either because it does not fall within an exempt category or because an exception makes the exemption unavailable— then the agency must proceed to the second tier and conduct an initial study."  (*San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1373.)  In so doing, the agency determines whether to proceed with CEQA review by way of a negative declaration or an environmental impact report (EIR).  "'CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment.'  [Citations.]  In certain situations where a straightforward negative declaration is not appropriate, the agency may permit the use of a mitigated negative declaration.  [Citations.]"  (*Ibid*.)

"If the project does not qualify for a negative declaration, 'the third step in the process is to prepare a full environmental impact report. . . .'  [Citations.] [¶] The California Supreme Court has 'repeatedly recognized that the EIR is the "heart of CEQA."'  [Citation.]  As the court observed more than three decades ago, 'since the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.'  [Citation.]  Other cases have since confirmed the statutory preference for resolving doubts in favor of an EIR.  [Citations.]"  (*San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1373*Id*. at pp. 1373-1374.)

---

**16**      "Thus, '[t]he first step in CEQA analysis, of course, is [a determination] whether the activity in question amounts to a "project." [Citation.]'  [Citation.]  An activity is not a 'project' if it has absolutely no potential to 'cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.'  [Citations.]"  (*May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1320.)

"'Substantial evidence' means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.] Substantial evidence 'shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' [Citation.] 'Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence.' [Citation.]" (*Pocket Protectors v. City of Sacramento*, *supra*, 124 Cal.App.4th at pp. 927-928.)

## II.    Standard of Review

### A.    *Traditional Mandamus*

Petitioners essentially claim the City has a mandatory ministerial duty to enforce the policy of the NELA Community Plan to "[s]upport the Southwest Museum as a cultural resource . . . and preserve its present location in Mt. Washington" and by consenting to the Project, which would result in the removal of artifacts in the Southwest Museum to be exhibited instead at the Autry Museum, the City violated the NELA Community Plan and thereby acted in a manner contrary to law. This claim is reviewed under traditional mandamus principles: "A writ of mandate may be issued by any court . . . to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station."[17]  (Code Civ. Proc., § 1085, subd. (a).)

"'A ministerial act is one that a public functionary ""is required to perform in a prescribed manner in obedience to the mandate of legal authority,""' without regard to his or her own judgment or opinion concerning the propriety of such act.' [Citation.]"

---

[17]    We note one court has concluded:  "[T]o the extent traditional mandate constitutes a proper remedy, the remedy of injunctive relief is also proper." (*Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1563, fn. 9.)  We conclude the converse is correct, namely, where traditional mandamus is not a proper remedy, the concomitant prayer for injunctive relief also is not proper, which is the case here.

22

(*Doe v. Albany Unified School Dist.* (2010) 190 Cal.App.4th 668, 682.)  "'Discretion . . . is the power conferred on public functionaries to act officially according to the dictates of their own judgment.'  [Citations.]  Thus, '[w]here a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take, that course of conduct becomes mandatory and eliminates any element of discretion.'  [Citation.]" (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1267.)

B.      *Mandamus Under CEQA—Administrative or Traditional*

"'In an action to set aside an agency's determination under [CEQA], the appropriate standard of review is determined by the nature of the proceeding below. . . . [S]ection 21168 "establishes the standard of review in administrative mandamus proceedings" under  Code of Civil Procedure section 1094.5 while section 21168.5 "governs traditional mandamus actions" under Code of Civil Procedure section 1085. [Citation.]  The former section applies to proceedings normally termed "quasi-adjudicative," "in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . . ." [Citations.]  The latter section applies to all other actions taken pursuant to CEQA and generally encompasses "quasi-legislative" decisions made by a public agency. [Citations.]'  [Citations.]"  (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1374-1375.)

"The distinction, however, is rarely significant.  In either case, the issue before the trial court is whether the agency abused its discretion.  Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence.  [Citations.]"  (*Gentry v. City of Murrieta*, *supra*, 36 Cal.App.4th at p. 1375.)  "'Review under administrative mandamus (§ 21168) and review under traditional mandamus (§ 21168.5) share many of the same characteristics.  There is no practical difference between the standards of review applied under traditional or administrative mandamus.'  [Citation.]"  (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 984.)

"In reviewing an agency's determination, finding or decision under CEQA, a court must determine whether the agency prejudicially abused its discretion. [Citation.] 'Abuse of discretion is established if the agency has not proceeded in a manner required by law *or* if the determination or decision is not supported by substantial evidence.' [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1132-1133, fn. omitted.)

"'An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' [Citation.]" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162.) "'The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. [Citations.]' [Citation.]" (*Santa Clarita Organization for Planning the Environment v. City of Santa Clarita* (2011) 197 Cal.App.4th 1042, 1049 (*Santa Clarita*).)

"We presume the correctness of the agency's decision." (*Santa Clarita*, *supra*, 197 Cal.App.4th 1042, 1050.) "Questions concerning the proper interpretation or application of the requirements of CEQA are matters of law. [Citation.]" (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 923.)

"'The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. [Citation.]' [Citation.] '[A]lthough the agency's factual determinations are subject to deferential review, questions of interpretation or application of the requirements of CEQA are matters of law.' [Citation.]" (*Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1277; see also *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 523; *Santa Clarita*, *supra*, 197 Cal.App.4th at p. 1050 [draw all reasonable inferences in support of agency's determination and resolve all conflicts in evidence in favor of its decision].) We therefore "accord more deference to agency decisions on substantive questions, and "'resolve reasonable doubts in favor of the

24

administrative finding and decision."'  [Citation.]"  (*Neighbors of Cavitt Ranch v. County of Placer* (2003) 106 Cal.App.4th 1092, 1101.)

## III.    Project Not "Piecemealed" from Greater Project

Petitioners contend the Project is an improper subterfuge to circumvent mandatory CEQA review of a greater project and for this reason approval of the Project must be overturned.  We disagree.

Indeed, "'[t]he requirements of CEQA cannot be avoided by piecemeal review which results from "chopping a large project into many little ones—each with a minimal potential impact on the environment—-which cumulatively may have disastrous consequences." [Citations.]'  [Citation.]  For example, '[w]here an individual project is a necessary precedent for action on a larger project, or commits the lead agency to a larger project, with significant environmental effect, an EIR must address itself to the scope of the larger project.'  [Citation.]  The prohibition against piecemeal review is the flip side of the requirement that the whole of a project be reviewed under CEQA.  [Citation.]"[18] (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1208.)

The record, however, does not support Petitioners' claim the Project is a mere "piecemealed" component of a greater project lying in the wings.  Rather, the evidence in the record supports a contrary conclusion:  Autry has abandoned its 2008 Earlier

---

**18**      In other words, "[w]here individual projects are, or a phased project is, to be undertaken and where the total undertaking comprises a project with significant environmental effect, the lead agency shall prepare a single program EIR for the ultimate project as described in Section 15168.  Where an individual project is a necessary precedent for action on a larger project, or commits the lead agency to a larger project, with significant environmental effect, an EIR must address itself to the scope of the larger project.  Where one project is one of several similar projects of a public agency, but is not deemed a part of a larger undertaking or a larger project, the agency may prepare one EIR for all projects, or one for each project, but shall in either case comment upon the cumulative effect." (Guidelines, § 15165.)

25

Expansion Project, and there is no evidence in the record that there are pending plans to resurrect that project in the foreseeable future.

We reject Petitioners' attendant contention that the Project violates CEQA's "piecemealing" prohibition, because the Project is simply a segment of the proposed 2010 "Autry Open" project which would entail remodeling the Autry Museum's entire first floor, i.e., 48,230 square feet, not merely the 18,000 square feet in this Project.

The record reveals although the Department staff evaluated Autry's initially proposed "Autry Open" plan, Autry did not follow through by seeking the consent of the R&P Board or City Council to the proposed plan. Autry has proceeded only with this Project. Petitioners fail to point to any relevant evidence in the record to support their claim the "Autry Open" plan remains on the back burner and Autry will execute that plan in the foreseeable future.

In any event, the proscription against "piecemealing" is inapplicable in this context. An EIR for a proposed project must include analysis of the environmental effects of future expansion if: "(1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396.) A "'Project' means *the whole of an action,* which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Guidelines, § 15378, italics added.) "CEQA forbids 'piecemeal' review of the significant environmental impacts of a project." (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1358.) Accordingly, "there may be improper piecemealing when the purpose of the reviewed project is to be the first step toward future development." (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1223.)

Mindful of the above, we conclude where, as here, the project is exempt from CEQA, any inquiry and discussion of whether the project is an improper

26

"piecemealed" segment of a greater project is irrelevant and meaningless. As we shall demonstrate, the Project involves remodeling a portion of the Autry Museum's first floor, i.e., 18,000 square feet, without any alteration to or expansion of the building's exterior. As such, the Project falls within a categorical exemption to CEQA mandates such as the preparation of an EIR. Similarly, the "Autry Open" plan, which would have involved remodeling of the entire first floor, i.e., 48,230 square feet, also would qualify for the same exemption.

## IV.    Project Categorically Exempt from CEQA Without Exception

Petitioners contend the Project is not exempt from CEQA, because it falls within an exception to exemption. We are not persuaded.

### A.    *Burden to Establish Exception to CEQA Exemption*

"If the agency determines one of the exemptions applies, the agency may prepare and file a notice of exemption [i.e., NOE], including a description of the project, a finding that the project is exempt under the relevant class or classes, and a brief statement of reasons supporting the finding. [Citation.] 'Where a project is categorically exempt, it is not subject to CEQA requirements and "may be implemented without any CEQA compliance whatsoever."' [Citation.]" (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 688. (*Save Our Carmel River*) .)

These "categorical exemptions are not absolute. Even if a project falls within the description of one of the exempt classes, it may nonetheless have a significant effect on the environment based on factors such as location, cumulative impact, or unusual circumstances. '[W]here there is any reasonable possibility that a project or activity may have a significant effect on the environment, an exemption would be improper.' [Citation.]" (*Save Our Carmel River*, *supra*, 141 Cal.App.4th at p. 689.)

"A determination by the agency that a project is categorically exempt constitutes an implied finding that none of the exceptions applies. [Citation.]" (*Save Our Carmel River*, *supra*, 141 Cal.App.4th at p. 689.)

The R&P Board found the Project was categorically exempt under the "Class 1" exemption, which applies to minor alterations relating to interior partitions, plumbing and

27

electrical conveyances to existing structures which would involve "negligible or no expansion of an existing use" or an increase of a structure to more than 2,500 feet. (Guidelines, §§ 15300, 15301, subds. (a) & (e), 15300.4; City CEQA Guidelines, art. III, § 1.a(1).)

**B.** ***No Showing of "Unusual Circumstances" Creating "Reasonable Possibility" of Significant Impact on Environment***

An activity within an exempt class nonetheless is subject to CEQA review if "unusual circumstances" exist which would create a "reasonable possibility" that the activity would have a significant impact on the environment. (Guidelines, § 15300.2, subd. (c).) The party challenging the exemption finding has the burden to establish such exception. (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1259.) Petitioners have failed to carry their burden to establish, by substantial evidence or a fair argument,[19] such an exception to such exemption exists.

1. *No "Unusual Circumstances" Identified or Described*

The Project presents no "unusual circumstances," and Petitioners have not offered any. The Project primarily involves remodeling a portion of the first floor of the existing Autry Museum, which would consist of rearranging some of its interior space but no change to its exterior. Petitioners fail to identify or otherwise describe in what particulars such a project would involve anything different than any other interior remodel project, namely, "unusual circumstances."

2. *No "Reasonable Possibility" of Significant Impact on Environment*

Even if such "unusual circumstances existed, Petitioners have failed to show a "reasonable possibility" the Project would give rise to a significant impact on the environment. Petitioners contend such an impact would result, because removal of the

---

**19** We note that our Supreme Court has not yet resolved the split at the appellate level as to which of these two standards of review applies to whether an exception to the CEQA exemption exists. We need not, and therefore do not, decide which of these two standards of review govern, because Petitioners cannot prevail under either standard. (See *Fairbank v. City of Mill Valley*, *supra*, 75 Cal.App.4th at pp. 1259-1260.)

Collection from the Southwest Museum would destroy its function as a museum and, thus, jeopardize and probably destroy its status as an official historical resource. Their underlying premise is the Collection must remain at the Southwest Museum, because the Collection itself is a historical resource and the Collection is integral to the identity or status of the Southwest Museum. This premise is fatally flawed.

As we shall demonstrate, it is for Autry to determine the placement and exhibition of the Collection. The Southwest Museum is a building located in the Mount Washington area, and the artifacts in the Collection are not physically a part of the building or its environs. The Collection was not a factor in the awarding the Southwest Museum official status as a historical resource. Removal of artifacts in the Collection therefore would not affect such status. The Collection itself does not qualify as a historical resource under CEQA. Removal of artifacts in the Collection cannot give rise to a significant impact on the environment of the Project, which is the Autry Museum in Griffith Park.

(a) Placement and Exhibition of Collection for Autry to Decide

Initially, we point out the disposition of the Collection and decisions regarding the Collection, e.g., the placement or exhibition—whether at the Southwest Museum, the Autry Museum, or elsewhere—of artifacts in the Collection, are matters solely within the province and control of Autry, as the owner of the Collection. These matters are outside the scope and purview of CEQA, regardless of whether they may be subject to restrictions or limitations pursuant to agreement or other factors.

(b) Removal and Display of Collection Artifacts Not CEQA Concerns

The removal of artifacts in the Collection away from the Southwest Museum, where they are stored rather than exhibited, or the exhibition of such artifacts at the Autry Museum, which activities would be encompassed within the Project, would not have a significant impact on the environment within the meaning of CEQA.

First, the Collection clearly constitutes a significant resource in a cultural context and a historical sense. Removal of artifacts in that Collection from the Southwest

29

Museum, however, does not compel an inescapable inference that a significant effect on the environment thereby will result. Generally speaking, the social significance of an artifact, which includes its cultural context, is inconsequential under CEQA, because substantial evidence that a project may have significant effect on the environment excludes "evidence of social . . . impacts that do not contribute to, or are not caused by, physical impacts on the environment." (§ 21080, subd. (e)(2).) The artifacts in the Collection neither contribute to nor are they caused by any physical impacts on the Southwest Museum.

Further, such removal would not "cause a substantial adverse change in the significance of an historical resource" which would equate with "a significant effect on the environment" under CEQA. (§ 21084.1.)

As a building, the Southwest Museum, through the auspices of Autry, obtained preservation protection as a "historical resource" (§ 21084.1) by its registration as a historical resource under the National Historical Register. Similarly, the Southwest Museum also achieved such status under the California Register of Historical Resources.

That neither the Collection nor any of its artifacts is "registered" with either of these two historical registers is not determinative. The lead agency has discretion to determine an "object" is "an historical resource," because the object is "historically significant or significant in the . . . social . . . or cultural annals of California," and its determination will be upheld if "supported by substantial evidence in light of the whole record. Generally, a resource shall be considered by the lead agency to be 'historically significant' if the resource meets the criteria for listing on the California Register of Historical Resources." (Guidelines, § 15064.5, subds. (a)(3) & (4); see also §§ 5020.1, subd. (j), 5024.1, subd. (g).)

No determination was made here that the Collection, or any of its artifacts, qualified as an "object" under the criteria of the California Register of Historical Resources for "historical resource" protection. Nor would such a determination have been supported by substantial evidence. "The term 'object' is used to describe those constructions that are primarily artistic in nature or are relatively small in scale and

30

simply constructed, as opposed to a building or a structure.  Although it may be moveable by nature or design, *an object is [an item] associated with a specific setting or environment*.  Objects should be in a setting appropriate to their significant historic use, role, or character.  Objects that are relocated to a museum are not eligible for listing in the California Register.  *Examples of objects include fountains, monuments, maritime resources, sculptures, and boundary markers*.”  (Guidelines, § 4852, subd. (a)(4), italics added.)

In other words, such an “object” necessarily is “site specific.”  As described earlier, the artifacts in the Collection are not “site specific” to the Southwest Museum.  Rather these artifacts are “‘from all parts of North America’” and include such items as “‘baskets as well as ceramics, kachinas, and textiles.’”  The Collection therefore would not qualify as a “historical resource” which is subject to preservation protection exclusively within the physical confines of the Southwest Museum.

Moreover, removal of artifacts in the Collection from the Southwest Museum would not cause “a substantial adverse change in the significance of [the Southwest Museum as] an historical resource,” which “change” translates into “a significant effect on the environment” under CEQA.  (§ 21084.1.)  Neither the location of the Collection at the Southwest Museum nor removal of artifacts in the Collection from that museum would affect the status of the Southwest Museum as “an historical resource” under the National Historical Register or under the California Register of Historical Resources.  Petitioners do not contend otherwise.

Second, removal of Collection artifacts from the physical environment of the Southwest Museum does not qualify as a significant impact on the environment.  “CEQA defines the relevant geographical environment as the area where physical conditions will be affected by the proposed project.  (§ 21060.5.)  Consequently, the project area does not define the relevant environment for purposes of CEQA when a project’s

31

environmental effects will be felt outside the project area."[20] (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1582.)

Assuredly, removal of Collection artifacts from the Southwest Museum will result in a physical change in the *contents* of the museum.[21] It does not follow such change translates into a significant impact, adverse or otherwise, on the Collection itself or in the physical environment of the Southwest Museum, which would not, in any event, be a physical change in the environment of the Project, namely, the Autry Museum.[22]

---

[20] "In determining whether there are significant environmental impacts, the lead agency must consider direct, and reasonably foreseeable indirect, 'physical changes in the environment.' (CEQA Guidelines, Cal. Code Regs., tit. 14, [div. 6,] ch. 3, § 15064(d).) A 'significant effect on the environment' is one that has both a substantial and adverse impact on physical conditions *within the area affected by the project*. (Guidelines, § 15382.)" (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266, fn. omitted, italics added.)

[21] The record reflects the entire Collection will not be removed from storage in the Southwest Museum to the Autry Museum. Rather, the Project will affect only less than 1 percent of the Collection.

[22] "'Significant effect on the environment' means a substantial, or potentially substantial, adverse change *in any of the physical conditions within the area affected by the project* including land, air, water, minerals, flora, fauna, ambient noise, and [in] objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to *a physical change* may be considered in determining whether the physical change is significant." (Guidelines, § 15382, italics added.)

"In evaluating the significance of the environmental effect of a project, the lead agency shall consider direct physical changes in the environment which may be caused by the project and reasonably foreseeable indirect physical changes in the environment which may be caused by the project.

"(1) A direct physical change in the environment is a physical change in the environment which is caused by and immediately related to the project. Examples of direct physical changes in the environment are the dust, noise, and traffic of heavy equipment that would result from construction of a sewage treatment plant and possible odors from operation of the plant.

"(2) An indirect physical change in the environment is a physical change in the environment which is not immediately related to the project, but which is caused indirectly by the project. If a direct physical change in the environment in turn causes

It is uncontroverted that the Southwest Museum is outside the Project. It is beyond dispute that the Southwest Museum is not located within the physical boundaries of the Autry Museum or within its neighborhood. It cannot be said that movement of artifacts in the Collection to the Autry Museum will in any way significantly impact the geographic environment of that museum or its surrounds. The Project simply affects the interior physical space of the museum building itself and does not affect its exterior walls. Similarly, removal of artifacts from the Collection stored at the Southwest Museum does not affect the physical space of that museum.

In short, removal of artifacts in the Collection from the Southwest Museum to the Autry Museum for exhibition would not have any significant impact on the environment within the meaning of CEQA. Accordingly, Petitioners have failed to show an exception to the CEQA exemption found by the R&P Board exists.

## V.    Project Not Inconsistent with NELA Community Plan

Petitioners contend the City acted contrary to law in approving the Project, because the Project is inconsistent with the NELA Community Plan, which is a component part of the City's General Plan concerning zoning. Their contention is unsuccessful.

Initially, we point out consistency or inconsistency with the NELA Community Plan is irrelevant to whether the Project complies with CEQA, which does not concern a municipality's zoning requirements, policies, or goals dehors a Project's environs. Moreover, although the NELA Community Plan encompasses the Southwest Museum, that plan does not include the Griffith Park neighborhood, in which lies the Griffith Park

---

another change in the environment, then the other change is an indirect physical change in the environment. For example, the construction of a new sewage treatment plant may facilitate population growth in the service area due to the increase in sewage treatment capacity and may lead to an increase in air pollution.

"(3) An indirect physical change is to be considered only if that change is a reasonably foreseeable impact which may be caused by the project. A change which is speculative or unlikely to occur is not reasonably foreseeable." (Guidelines, § 15064, subd. (d).)

33

Museum, i.e., the location of the Project. In addition, the Project does not concern any future activities of the essentially closed Southwest Museum.[23]

Cutting to the chase, we address and reject Petitioners' position that the City's approval of the Project would diminish, if not destroy, the Southwest Museum as a museum in violation of the purpose and goal of the NELA Community Plan, specifically its Policy 14-3.1, to preserve and enhance the museum function of the Southwest Museum.

The basic fallacy of this position is reflected in its underlying premise that the NELA Community Plan, specifically its Policy 14-3.1, forbids, and thereby precludes, the City from approving the Project, because implementation of the Project would result in removal of the Collection from that museum to the Autry Museum.

Although a goal of the NELA Community Plan is to preserve and promote the Southwest Museum, this goal pertains to the building itself, not its contents. This is self-evident from a review of Policy 14-3.1, which reads: "Support the Southwest Museum as a cultural resource, encourage expansion both on and off site, and preserve its present location in Mt. Washington. [¶] **Program**: The Plan's policies and programs, regarding transit stations and transit-oriented districts improve the viability and accessibility of the museum and reinforce its significance as a focal point of the community."

## CONCLUSION

The Project is exempt from CEQA. In approving the Project, the R&P Board therefore properly issued the 2011 NOE and thereby consented to Autry proceeding with the Project without regard to additional CEQA compliance. The City Council thus did

---

[23] In the FEIR for the Earlier Expansive Project, the Department explained the reference to the NELA Community Plan was made in the context of analysis of the land use impacts of "Alternative E—Expansion of the Arroyo Campus," because "the Arroyo Campus is located within the [NELA] Community Plan area. . . . [T]he Arroyo Campus[,however,] is not part of [that] project" and "the project would not result in any environmental impacts within the Arroyo Campus. Thus, policies within the [NELA] Community Plan are not relevant to the proposed project, which is located within the Hollywood Community Plan."

34

not abuse its discretion in approving the R&P Board's decision and findings.  Further, the City Council did not act in a manner contrary to law by consenting to the Project, which did not violate the NELA Community Plan.

## DISPOSITION

The judgment is affirmed.  Respondents and Real Party in Interest shall recover their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                              BOREN, P.J.

We concur:


    CHAVEZ, J.


    FERNS, J.*


_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.