Filed 2/10/21  Val Verde Civic Assn. v. County of L.A. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION TWO

| | |
|---|---|
| VAL VERDE CIVIC ASSOCIATION et al., | B302885 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS170715) |
| v. | |
| COUNTY OF LOS ANGELES, | |
| Defendant; | |
| CHIQUITA CANYON, LLC, | |
| Real Party in Interest and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Law Office of Babak Naficy and Babak Naficy for Plaintiffs and Appellants.

Cox, Castle & Nicholson, David P. Waite, Michael H. Zischke and Lisa M. Patricio for Real Party in Interest and Respondent.

No appearance for Defendant.

_____

Petitioner and appellant Santa Clarita Organization for Planning the Environment (SCOPE) appeals from the order denying its petition for writ of administrative mandamus. SCOPE's petition sought to set aside the County of Los Angeles's (County's) approval of a master plan revision (the Project) that continued and expanded operations at the Chiquita Canyon Landfill (Landfill).  The Landfill is currently operated by real party in interest Chiquita Canyon, LLC (Chiquita Canyon or respondent).  SCOPE contends the County failed to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000, et seq. (CEQA).)  We affirm the trial court's order.

## BACKGROUND

### The Landfill

The Landfill is a 639-acre Class III municipal solid waste facility located in the northwestern portion of unincorporated Los Angeles County.  Hillsides separate the Landfill from the nearby residential community of Val Verde.  The nearest residence in Val Verde is approximately 500 feet from the Landfill.

The Landfill was originally approved and began operations in the mid-1960s.  The County approved a series of conditional use permits (CUPs) to continue and expand Landfill operations in 1977, 1982, and 1997.  The 1997 CUP was scheduled to expire on November 24, 2019, or when the Landfill reached the waste disposal limit of 23 million tons, whichever occurred first.  The 1997 CUP allowed the Landfill operator to apply for new permits to expand or modify the conditions of the CUP.

**Project approval process**

The Landfill's prior operator filed a CUP application in 2004 to continue and expand the Landfill's operations. Chiquita Canyon purchased the Landfill in 2009 and in 2011 reinitiated the prior operator's CUP application.

In November 2011, the County published a Notice of Preparation of an environmental impact report (EIR) for the Project, with an initial public review period through January 12, 2012, extended to February 13, 2012, for a total of 77 days. On December 6, 2011, the County held a scoping meeting in Val Verde to solicit public comment. Thereafter, the County circulated a Draft EIR (DEIR) for an initial public review of 45 days -- from July 10 to August 23, 2014, extended to October 23, 2014, for a total of 105 days. On July 31, 2014, the County held a public hearing on the DEIR in Castaic.

While the CUP application review process was pending, the Landfill was approaching its 29-million-ton disposal capacity limit. Chiquita Canyon therefore requested a waiver, pursuant to Los Angeles County Code section 22.04.110, to allow continued operation of the Landfill. The County approved a waiver in March 2016.

In response to comments on the DEIR, the County published on November 9, 2016 a Partially Recirculated Draft EIR (PR-DEIR) that presented new information on certain chapters, including air quality, greenhouse gas emissions, and climate change. The PR-DEIR was circulated for 60 days, through January 9, 2017. The County held a further public hearing on the PR-DEIR on December 15, 2016.

The County published the Final EIR (EIR) in February 2017. A public hearing on the EIR was held in the spring of

3

2017.  At the conclusion of the hearing, the Project was approved, with certain modifications.

Chiquita Canyon, SCOPE, and two other entities[1] appealed the Project approval to the County Board of Supervisors (the Board).  The Board held a public hearing on the appeals on June 27, 2017.  At the conclusion of the hearing, the Board certified the EIR, adopted the CEQA findings, Statement of Overriding Considerations (SOC), and Mitigation Monitoring and Reporting Program (MMRP), and indicated its intent to deny the appeals.

The Board instructed County Counsel to prepare final findings and conditions for the Board's consideration, including modifications to conditions approved by the County's Regional Planning Commission.  On July 25, 2017, the Board found the Project was necessary to achieve the County's sustainable waste management goals, denied the appeals, certified the EIR, adopted the CEQA findings, the Statement of Overriding Considerations and the Mitigation Monitoring and Implementation Plan, and adopted the Project as revised.  The County filed a Notice of Determination on July 25, 2017.

**Writ petition**

SCOPE filed a writ petition to set aside the County's approval of the Project, arguing, among other things, that the County failed to adequately analyze Landfill impacts on air quality, odor, and climate change, and that the County's findings

_____

[1]      Val Verde Civic Association and Citizens for Chiquita Canyon Landfill Compliance, who are not parties to this appeal, participated in the administrative appeal process and the mandamus proceedings below.

4

in support of the Project were not supported by substantial evidence. The trial court denied the petition, finding that substantial evidence supported the County's methodology for assessing air quality impacts, odor emissions and mitigation, and greenhouse gases.

This appeal followed.

## CONTENTIONS ON APPEAL

SCOPE contends the County's approval of the Project violated CEQA because the EIR is deficient in the following ways:

1. The EIR fails to quantify and document existing Landfill emissions.

2. The ambient air quality analysis improperly relies on criteria air pollutant data from offsite regional air monitoring stations instead of local air quality data the County could have collected in the Project's vicinity.

3. The odor impact analysis is based on an unreasonable threshold of significance.

4. The EIR improperly defers the formulation of odor mitigation measures and fails to set forth the necessary details of the odor impact minimization plan required by California law.

5. The EIR fails to adequately estimate the Landfill's capture of methane and other greenhouse gases.

## DISCUSSION

### I. Standard of review

In an action challenging the decision of a public agency under CEQA, our review is limited to determining whether a prejudicial abuse of discretion occurred. Abuse of discretion is established if the agency failed to proceed in a manner required

5

by law or if the decision is unsupported by substantial evidence. (Pub. Resources Code, § 21005; *Santa Clarita Organization for Planning the Environment v. City of Santa Clarita* (2011) 197 Cal.App.4th 1042, 1050 (*Santa Clarita*).) We review de novo whether the agency has followed the correct procedures; however, we accord greater deference to the agency's factual conclusions. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412 435.) The substantial evidence test applies "to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898 (*City of Long Beach*).)

"'Substantial evidence'" is defined in CEQA's implementing regulations, commonly referred to as the CEQA Guidelines,[2] as "'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.'" (Cal. Code Regs., tit. 14, § 15384, subd. (a).) 'The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's

_____

[2]	Regulations guiding application of CEQA, found in title 14 of the California Code of Regulations, section 15000 et seq., are often referred to as the CEQA Guidelines. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319.)

6

decision.  [Citation.]'  [Citation.]" (*Santa Clarita, supra,* 197 Cal.App.4th at p. 1050.)

The public agency's decision is presumed to be correct.  The project opponents bear the burden of proving that that the methodology used in an EIR rendered the analysis legally inadequate.  (*City of Long Beach v. City of Los Angeles* (2018) 19 Cal.App.5th 465, 485-486 (*Long Beach*).)

## II.  Existing emissions

SCOPE did not argue in the mandamus proceedings below that the EIR is deficient because it contains no quantification or analysis of existing Landfill emissions and therefore forfeited that argument on appeal.  (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 948-949 [failure to properly tender an issue in the trial court forfeits the issue for purposes of appellate review].)  We accordingly do not address the argument.

## III.  Use of monitoring station data for criteria air pollutants

### A.  Regulatory framework

Criteria air pollutants (ozone, carbon monoxide, particulate matter, nitrogen dioxide, sulfur dioxide, and lead) are regulated by federal and state ambient air quality standards.  Criteria air pollutant levels are measured by their concentrations in the general atmosphere.  In the South Coast air basin, which includes Los Angeles County, criteria air pollutant concentrations are measured at regional air monitoring stations operated and maintained by the South Coast Air Quality Management District (SCAQMD).  The SCAQMD is the agency responsible for

regulating nonvehicular air pollution in certain counties in Southern California, including Los Angeles County. (*Communities for a Better Environment v. South Coast Air Quality Management Dist., supra,* 48 Cal.4th at p. 317.)

The SCAQMD reviews air quality impact issues for individual project approvals by local governments during the CEQA EIR process. (Del Duca and Mansueto, *Indirect Source Controls: An Intersection of Air Quality Management and Land Use Regulation* (1991) 24 Loy. L.A. L.Rev. 1131, 1170.) The SCAQMD analyzes a project's impact on criteria air pollutants by determining whether the project will cause or contribute to the South Coast air basin's exceedance of ambient air quality standards. SCAQMD guidelines[3] recommend using five years of regional monitoring data as a baseline for assessing a project's impact on criteria air pollutants. This data can be obtained from regional air quality monitoring stations operated and maintained by the SCAQMD.

In accordance with SCAQMD guidelines, the County obtained regional air quality data for a six-year period from the three SCAQMD monitoring stations closest to the Landfill to establish a baseline for ambient air concentrations of criteria pollutants. The County input that data, along with projected criteria air pollutant emissions for the Project, into AERMOD, a

_____

[3] The SCAQMD guidelines are set forth in the agency's CEQA Handbook, a document "intended to provide local governments, project proponents, and consultants who prepare environmental documents with guidance for analyzing and mitigating air quality impacts of projects." The CEQA Handbook also describes the criteria the SCAQMD uses when reviewing and commenting on the adequacy of environmental documents.

8

standard dispersion model approved by the U.S. Environmental Protection Agency and the SCAQMD. The AERMOD model was used to assess potential ambient air quality impacts for the Project in comparison with federal and state ambient air quality standards and SCAQMD thresholds for CEQA analysis.

### B. Substantial evidence supports the use of monitoring station data

Substantial evidence supports the County's use of SCAQMD monitoring station data on criteria air pollutants, its reliance on SCAQMD guidelines to establish the baseline for assessing the Landfill's impact on criteria air pollutants, and the air quality findings based on the data. (*City of Long Beach, supra,* 176 Cal.App.4th at p. 898 [substantial evidence test applies to "the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied"].) SCAQMD guidelines recommend that five years of regional meteorological data be used to establish a baseline for ambient air concentrations of criteria pollutants. The County used six years of meteorological data from SCAQMD monitoring stations at three locations closest to the Landfill. The monitoring stations are part of a statewide network operated continuously by the SCAQMD in accordance with strict protocols for sampling, analysis, data validation, and reporting.

There is no evidence that the County's reliance on data from the SCAQMD's air quality monitoring stations resulted in inadequate or deficient ambient air quality baseline information. SCOPE's unsupported assertions that site-specific data could have been obtained, or that other methodologies could have been applied to assess the Landfill's air quality impacts, are

insufficient to satisfy its burden of proving that the air quality analysis in the EIR is legally inadequate. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117.)

SCOPE cites CUP Condition 68 as evidence that collecting local air quality data was feasible and should have been undertaken as part of the EIR process. CUP Condition 68 requires Chiquita Canyon, as a condition to issuance of the new permit, to install air monitoring stations at locations within a five-mile radius of the Landfill, to conduct random air quality tests at these locations, and to report quarterly and annual test results to the SCAQMD and the Department of Public Health. That local air monitoring might have been useful at the time the EIR was prepared does not mean it was necessary. "CEQA does not require a lead agency to conduct every recommended test and perform all recommended research to evaluate the impacts of a proposed project. The fact that additional studies might be helpful does not mean they are required." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1396.) "A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 415 (*Laurel Heights*).)

The SCAQMD guidelines undermine SCOPE's argument that collecting air quality data in the vicinity of the Landfill would have yielded a more accurate baseline for criteria pollutants. The guidelines state in pertinent part:

"Modeling for criteria pollutants . . . should use the most recently available and meteorologically-

10

appropriate 5-year data set. . . .  Considerations for choosing a meteorological station include[] the source's meteorological conditions (such as prevailing winds, mixing heights, etc.), terrain, surrounding land use and surface characteristics, and proximity. This means that the closest meteorological station to the source under review is not always the most representative meteorologically."

SCOPE fails to meet its burden of establishing that the County's use of regional monitoring station data on criteria pollutants rather than data collected locally resulted in a legally inadequate analysis of the Project's ambient air quality impacts.

The record shows, moreover, that the County did use local, site-specific air quality data when available and appropriate. The EIR used site-specific data to estimate Project-related landfill gas emissions.  The EIR also used local data for analyzing carbon monoxide impacts, composting operation impacts, and odor analysis.

SCOPE cites *Long Beach* as support for its argument that the County's reliance on the SCAQMD data and methodology was improper.  That case, however, is distinguishable.  The court in *Long Beach* found the EIR's air quality analysis of a proposed railyard to be incomplete because it failed to discuss or analyze relevant data that had been collected and included in the EIR. That data indicated that concentrations of particulate matter ($PM_{10}$, a criteria air pollutant), would be substantially increased in the area immediately surrounding the proposed railyard. (*Long Beach, supra*, 19 Cal.App.5th at p. 487.)  The EIR in *Long Beach* failed to disclose or estimate how frequently and for what

length of time the level of $PM_{10}$ in the surrounding area (in which homes and schools were located) would exceed the standard of significance. (*Ibid.*) Here, there is no evidence showing substantial geographic variations in criteria pollutant emissions or concentrations, and the EIR does not fail to discuss or analyze the collected data.

*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th 99, on which SCOPE also relies, is equally distinguishable. In that case, the project proponents, owners of 891 acres of ranch property in the Carmel River watershed, sought county approval to develop and build 117 homes. Water availability is a critical problem in the Carmel Valley, and the EIR required that post-development water usage not exceed pre-project baseline levels. (*Id.* at pp. 108, 114.) No documentation existed that could confirm the property's historical water usage. (*Id.* at p. 111.) The EIR proposed alternative methods for calculating baseline water usage. One method used a standard formula for estimating water use on irrigated pastureland, based on representations by the project applicants that 21 acres had been irrigated. (*Id.* at p. 114.) An alternative method relied on recent water meter readings; however, extensive aquifer testing had been performed during some of the years that meter readings were recorded. (*Id.* at pp. 123-124.) The court found both methodologies to be legally insufficient. The first method was rejected based on a lack of substantial evidence that the property had been irrigated. (*Id.* at p. 121.) The court discounted the project proponent's representations about the property's historical water use as "'unsubstantiated opinion or narrative.'" (*Id.* at p. 122.) The second method, which relied on water meter readings, the court

found deficient because it failed to account for substantial quantities of water used for aquifer testing rather than irrigation. (*Id.* at p. 124.) No similar issues are present in this case. The relevant analysis here was whether the Project would cause or contribute to the South Coast air basin's exceedance of federal and state ambient air quality standards for criteria air pollutants. In the South Coast air basin, ambient air concentrations of criteria air pollutants are measured at regional air monitoring stations operated and maintained by the SCAQMD. The County's use of SCAQMD monitoring station data to establish a baseline for assessing Project impacts on ambient air concentrations of criteria air pollutants was not unsubstantiated or legally deficient.

## IV. Odor impacts
### A. Methodology used in the EIR

To analyze odor impacts, the County used Appendix G of the CEQA Guidelines, which assesses whether the Project would result in "other emissions (such as those leading to odors) adversely affecting a substantial number of people." The SCAQMD threshold for determining whether a use is a substantial source of odor is whether it constitutes a nuisance under SCAQMD rule 402.[4] Because the SCAQMD rules set no

_____

[4] SCAQMD rule 402 states: "A person shall not discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public, or which endanger the comfort, repose, health or safety of any such persons or the public, or which cause, or have a natural tendency to cause, injury or damage to business or property. [¶] The provisions of this rule shall not apply to odors emanating

13

numerical threshold of significance for odor emissions, the County applied the methodology used by the Bay Area Air Quality Management District (BAAQMD). The BAAQMD CEQA guidelines recommend reviewing odor complaints from the previous three years. The BAAQMD guidelines consider a source to have a substantial number of odor complaints if the complaint history includes five or more confirmed complaints per year averaged over a three-year period. A verified complaint is one in which an Air Quality Management District inspector performs an odor survey in response to the complaint and confirms the presence of an odor outside the landfill boundaries that can be attributed to the landfill.

SCAQMD records for the Landfill show three verified odor complaints, an average of 0.6 confirmed complaints per year over the five-year period between August 2007 to July 2012. Under the BAAQMD CEQA guidelines for odors, the EIR concluded that the Landfill did not have significant odor impact on receptors.

In its comments on the PR-DEIR, the SCAQMD noted that the Landfill is in a remote area, its inspectors cannot always investigate odor complaints in a timely manner, and "odors may dissipate by the time an inspector arrives to investigate odor complaints." For this reason, the SCAQMD commented that the total number of complaints, rather than verified complaints, was a more appropriate indicator of odor impacts.

The County disagreed with the SCAQMD and explained in the EIR its reasons for assessing odor impacts based on verified

_____

from agricultural operations necessary for the growing of crops or the raising of fowl or animals." (Rule 402 Nuisance (May 7, 1976) <https://www.aqmd.gov/docs/default-source/rule-book/rule-iv/rule-402.pdf?sfvrsn=4> [as of Feb. 4, 2021].)

complaints instead of all complaints received. Verified complaints, the County noted, are substantiated by an inspector, who confirms that the Landfill is the source of the odor. Absent such verification, the number of complaints is a less reliable indicator. The County noted that a substantial increase in odor complaints occurred after the DEIR was released in July 2014 (73 complaints, none verified by the SCAQMD, within one month of the DEIR release, as compared to 10 complaints, also unverified, for the month preceding release), suggesting a NIMBY effect rather than an increase in odor events.

### B. Substantial evidence supports the odor impact analysis

SCOPE's challenge to the odor impact analysis is based primarily on the SCAQMD's comment to the PR-DEIR that the total number of complaints is a more reliable indicator of odor impacts than verified complaints. The SCAQMD's disagreement with the County's metric for significance is not a sufficient basis for setting aside the EIR. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 625-626.) "[E]vidence of a disagreement with other agencies is not enough to carry the burden of showing a lack of substantial evidence to support the [EIR] finding." (*Id.* at p. 626.)

Substantial evidence supports the County's methodology for assessing odor impacts. As the trial court noted, the record shows the SCAQMD generally investigates Landfill odor complaints in a timely manner. From January 1, 2014 through September 8, 2014, the SCAQMD received 146 odor complaints concerning the Landfill. Approximately one-half of these complaints were resolved by telephone and/or investigated the

15

next business day.  None of these investigated complaints were verified.

That inspectors cannot timely respond to all odor complaints (many of which are received by telephone at night when the SCAQMD offices are closed), does not demonstrate that the County's reliance on verified odor complaints as a threshold of significance is unsupported by substantial evidence.  Under the substantial evidence standard, a reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." (*Laurel Heights, supra,* 47 Cal.3d at p. 393.)  We do not reweigh conflicting evidence but must resolve all reasonable doubts in favor of the administrative findings and decision.  (*Ibid.*)

SCOPE also takes issue with the method the County used for counting verified complaints, claiming it undercounts the actual number of verified odor complaints.  The EIR treats each day on which one or more verified complaints was received as a single complaint rather than counting each verified complaint individually.  As respondent notes, SCOPE's claim fails to recognize that verified complaints received on the same day are related to a single odor event.  Multiple complaints about the same odor event reflect multiple complainants, not multiple odor events.  SCOPE fails to establish that the County's method of counting verified complaints was unreliable or unreasonable.

The record shows, moreover, that in the EIR the County provided an updated and expanded odor analysis that included the results of an odor study conducted by experts who visited approximately 50 locations within the Landfill and nearby areas on 25 different mornings over two seasons.  The study concluded "very few odors believed to originate from the landfill were

detected outside of the landfill boundaries and landfill odor was confirmed only once within the Val Verde community." The conclusions derived from the odor analysis study constitute substantial evidence. (Pub. Resources Code, § 21082.2, subd. (c) [substantial evidence includes "expert opinion supported by facts"].) SCOPE challenges the methodology used in the odor analysis study and the validity of the conclusions reached; however, the issue is not whether the study is irrefutable or whether it could have been better. The relevant issue is whether the study is sufficiently credible to constitute substantial evidence in support of the conclusions. (*Laurel Heights, supra,* 47 Cal.3d at p. 393; *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 372.) Substantial evidence supports the odor impact analysis and findings.

## V. Odor mitigation measures
### A. Regulatory framework

"CEQA requires an EIR to propose and describe mitigation measures to minimize a project's significant environmental impacts. (Pub. Resources Code, §§ 21002.1, subd. (a), 21100, subd. (b)(3).)" (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 240.) "An EIR may not defer the formulation of mitigation measures to a future time. . . . ([Cal. Code Regs., tit. 14, § 15126.4] subd. (a)(1)(B).)" (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 280.) The specific details of a mitigation measure may be developed after project approval, however, if including those details in the EIR is impracticable or infeasible, so long as the lead agency commits itself to mitigation, adopts specific performance standards, and identifies actions for achieving the

17

performance standards that will be considered, analyzed, and potentially incorporated into the mitigation measure. (CEQA Guidelines, § 15126.4, subd. (a)(1)(B); *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793.)

The EIR identified two potential odor sources at the Landfill: composting operations and landfill operations. All commercial composting operations in California must comply with California Code of Regulations, title 14, section 17863.4, which requires implementation of an odor impact minimization plan (OIMP). (Cal. Code Regs., tit. 14, § 17863.4 (section 17863.4).) Although California law does not require an odor mitigation plan for landfill operations, Chiquita Canyon agreed to adopt an Odor Reduction Measure for those operations.

Section 17863.4 requires that an OIMP include the following elements, or an explanation as to why an element was not included:

"(1) An odor monitoring and data collection protocol that describes the proximity of possible odor receptors and a method for assessing odor impacts at the locations of the possible odor receptors;

"(2) A description of meteorological conditions affecting odor migration and/or transport of odor-causing material off-site. Seasonal variations that affect wind velocity and direction must also be described;

"(3) A complaint response and recordkeeping protocol;

"(4) A description of design considerations and/or projected ranges of optimal operation to be employed to minimize odor, including method and degree of aeration, moisture content of materials, feedstock characteristics, airborne emission

production, process water distribution, pad and site drainage and permeability, equipment reliability, personnel training, weather event impacts, utility service interruptions, and site specific concerns as applicable;

"(5) A description of operating procedures for minimizing odor, including aeration, moisture management, feedstock quality, drainage controls, pad maintenance, wastewater pond controls, storage practices (e.g., storage time and pile geometry), contingency plans (i.e., equipment, water, power, and personnel), biofiltration, and tarping as applicable."  (Cal. Code Regs., tit. 14, § 17863.4, subd. (b).)

The OIMP must be reviewed annually and revised, as necessary, to reflect any changes.  The OIMP and any revisions must be provided to the local enforcement agency, in this case, the County, within 30 days of any changes.  (Cal. Code Regs., tit. 14, § 17863.4, subds. (c), (d).)  The County can enforce the OIMP by issuing a compliance order.  (*Id.* subd. (e); 18304.)

### B.  The OIMP for the Landfill

SCOPE fails to establish that the County improperly deferred formulation of odor mitigation measures.  The conditions to issuance of the CUP incorporate SCAQMD rule 401 as a qualitative performance standard, requiring Chiquita Canyon to comply with all odor abatement and prevention rules promulgated by the SCAQMD and the County Department of Public Health.  The OIMP requires Chiquita Canyon to abate any nuisance odors in the adjacent residential and business areas, and to terminate composting operations if it is unable to do so. The OIMP adopts specific mitigation measures, including a requirement that the location of the composting operations be

19

approved by the County Director of Public Works in an area away from residences and businesses.  The OIMP requires Chiquita Canyon to maintain a log demonstrating compliance with the OIMP and documenting the effectiveness of odor mitigation measures.  Both the County Department of Public Works and the Department of Public Health are authorized to require Chiquita Canyon to implement additional corrective measures for odor complaints when "deemed necessary to protect public health and safety."

The EIR also identifies specific odor control management practices to be considered and potentially included in the OIMP. These include requiring substrate haulage to the composting facility in covered, liquid leak-proof containers; setting time limits for onsite retention of undigested compostable materials; providing enclosed, negative pressure buildings for indoor receiving and pre-processing of compostable materials; treating the air in the indoor receiving buildings with a biofilter or scrubbing system; and managing delivery schedules to facilitate prompt handling of odorous materials.

Substantial evidence supports the trial court's findings that the County did not improperly defer formulation of the OIMP but committed to odor mitigation, adopted performance standards, and identified measures to achieve those standards.

## VI. Greenhouse gas emissions
### A. Methodology used in the EIR
Landfill gas is a natural byproduct of the decomposition of organic material in landfills.  It consists primarily of carbon dioxide and methane, greenhouse gases that contribute to global warming.  Chiquita Canyon collects most of the landfill gas

generated at the Landfill and combusts it in either an onsite landfill gas-to-energy plant or onsite flares.

Chiquita Canyon can measure the amount of landfill gas that is flared or collected by the landfill gas-to-energy plant but must rely on a model to estimate the quantity of landfill gas that is generated. The EIR uses the U.S. Environmental Protection Agency's Landfill Gas Emissions Model (LANDGEM) to estimate the amount of landfill gas produced at the Landfill. The data produced by LANDGEM is a reasonable forecast of landfill gas generation; however, it is not actual, historical data. As with all models, LANDGEM has its limitations. For example, it assumes unchanging conditions in predicting landfill gas generation whereas landfill conditions are constantly changing. The LANDGEM model is nevertheless considered to be the industry standard and it is regularly used to predict landfill gas generation in California. The difference between the amount of landfill gas generated (a modeled data point) and the amount of landfill gas collected (based on actual historical data) represents the amount of fugitive landfill gas emissions.

The EIR concludes that the Project will result in less than significant greenhouse gas emissions impacts until 2020. That conclusion is based on an assumed landfill gas emission capture rate of 81.7 percent, which would be increased to 85 percent upon implementation of a best management practice.

The 81.7 percent and 85 percent landfill gas capture rates are based on two site-specific engineering analyses -- one prepared by Golder Associates, and the other by SCS Engineers. The Golder analysis initially determined that the Landfill on average achieves an estimated landfill gas capture rate of 85 percent. The 85 percent capture rate was incorporated into the

DEIR. The SCAQMD, in its comments to the DEIR, however, noted that it had not been provided with a copy of the Golder report to verify the calculations and assumptions supporting an 85 percent collection efficiency rate and recommended using an industry default rate of 75 percent. After further review and consultation by and among the SCAQMD, the County, and Golder Associates, an estimated landfill gas collection efficiency rate of 81.7 percent was included in the EIR.

SCS Engineers prepared a second analysis, concluding that implementing a best management practice -- converting 40 acres of existing intermediate landfill cover to a more efficient final cover -- would increase the landfill gas capture efficiency rate from 81.7 to 85 percent. The County accepted SCS Engineers' analysis and incorporated that best management practice and the enhanced landfill gas capture efficiency rate into the EIR.

### B. Substantial evidence supports the greenhouse gas findings and analyses

SCOPE contends the landfill gas capture efficiency rates used in the EIR are unreliable and unsupported by substantial evidence. SCOPE cites data included in the EIR showing that from 2008 to 2014, the average reported landfill gas capture rate ranged from 71 to 78 percent -- very close to the 75 percent default rate initially recommended by the SCAQMD.

SCOPE also cites data in the EIR showing landfill gas collection efficiency rates for the years 2001 to 2007 ranging from 88 to 106 percent -- substantially higher than the capture rates for the years 2008 to 2014. SCOPE argues that EIR provides no explanation for this discrepancy or why a collection efficiency rate that exceeds 100 percent can be considered reasonable. SCOPE

further argues that the collection efficiency rates are unreliable given these data discrepancies.

SCOPE raised these same arguments in its public comments to the DEIR.  In the EIR and in its response to public comments, the County acknowledged that a default landfill gas collection efficiency rate of 75 percent was generally used prior to the California Air Resources Board's adoption of California's Landfill Methane Regulation (Cal. Code Regs., tit. 17, §§ 95460 to 95476), which imposed more stringent methane emissions standards and emission collection and control requirements on landfills in California.  The County explained, however, that since the June 2010 effective date of the Landfill Methane Regulation, the California Air Resources Board had undertaken more recent technical analyses and found landfill gas collection efficiencies of 83 percent and 87 percent to be more representative of California landfills.  The County further explained that an efficiency rate exceeding 100 percent is not an anomaly in the data, but the result of comparing data from actual and modeled sources.  When the LANDGEM model predicts less landfill gas generated than is actually collected onsite, it can result in a landfill gas collection efficiency rate that exceeds 100 percent.

The Golder report included in the EIR explains the year to year variations in landfill gas collection efficiency rates.  The report states that landfill conditions are constantly changing, including some years of record-setting drought in California and varying municipal solid waste streams, whereas the LANDGEM model assumes unchanging conditions in predicting landfill gas generation.

23

The CEQA Guidelines in effect at the time the EIR was finalized gave a lead agency "discretion to determine, in the context of a particular project, whether to: [¶] (1) Use a model or methodology to quantify greenhouse emissions resulting from a project, and which model or methodology to use . . . provided it supports its decision with substantial evidence. . . ." (CEQA Guidelines, former § 15064.4, subds. (a), (b).) Substantial evidence supports the County's use of modeled data to quantify greenhouse gas emissions and to determine the landfill gas collection efficiency rate at the Landfill. That evidence consists of site-specific engineering studies prepared by two different experts and studies and analyses performed by the California Air Resources Board. Substantial evidence for purposes of CEQA review, includes "expert opinion supported by facts." (Pub. Resources Code, § 21080, subd. (e)(1).) SCOPE fails to demonstrate that the methodology used by the County to quantify greenhouse gas emissions was legally inadequate.

## DISPOSITION

The order denying the petition for writ of administrative mandamus is affirmed. Respondent shall recover its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.       _____, J.
LUI                                HOFFSTADT


24